# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 08-2620

_____

M.M. Silta, Inc.,                          *
                                           *
            Plaintiff/Appellee,            *
                                           *
      v.                                   *
                                           *
Cleveland Cliffs, Inc.;                    *   Appeal from the United States
Cliffs Mining Company,                     *   District Court for the
                                           *   District of Minnesota.
            Defendants,                     *
                                           *
Cliffs Erie, L.L.C.,                       *
                                           *
            Defendant/Appellant,           *
                                           *
John Does, Number 1 through 5,             *
                                           *
            Defendants.                     *

_____

Submitted: March 11, 2009
Filed: July 16, 2009

_____

Before WOLLMAN, BRIGHT, and COLLOTON, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

M.M. Silta, Inc. (Silta)[1] brought this breach of contract action against Cliffs Erie, L.L.C. (Cliffs), alleging that Cliffs failed to perform its obligations under two agreements stemming from reclamation of a Minnesota taconite mine.[2] A jury returned a verdict for Silta on one of its contract claims, and Cliffs appeals, arguing that the district court[3] submitted an erroneous jury instruction, that the contract was invalid, and that the damage award was disproportionate as a matter of law. We affirm.

I.

Cliffs is a wholly owned subsidiary of Cleveland-Cliffs, Inc., an international iron ore producer operating mines in Michigan, Minnesota, and eastern Canada. In early 2002, Cliffs began liquidating the assets of a Hoyt Lakes, Minnesota, mine that it had purchased from a bankrupt competitor. The liquidation was a massive undertaking, involving the sale of thousands of pieces of equipment scattered across the more than 30,000 acre mine.

---

[1]We use "Silta" to refer to both M.M. Silta, Inc. and its eponymous owner, Melvin Silta.

[2]The first agreement, which accounted for the majority of the testimony and argument in the one-week trial, involved an arrangement whereby Silta would reclaim iron ore pellets for sale by Cliffs. The contract called for Cliffs to pay a specified price for each ton of iron ore that was sold. Although Silta spent a year reclaiming pellets, Cliffs terminated the agreement without selling any of the material, claiming that sale was not economically feasible. The jury found for Cliffs on Silta's $3.5 million claim, and that verdict has not been appealed.

[3]The Honorable Michael J. Davis, Chief Judge, United States District Court for the District of Minnesota.

Stephen DeVaney was charged with selling the equipment on Cliffs' behalf. DeVaney had thirty years of experience in the mining industry and had served as the manager of purchasing at the Hoyt Lakes mine when the facility was operational. DeVaney later explained that his goal was to sell anything for which he could find a buyer, and he often sold at prices far below market value.

Melvin Silta, the owner and primary employee of M.M. Silta, Inc., was a frequent customer of DeVaney's. Between 2002 and 2006, Silta purchased hundreds of items from the mine, paying approximately $3.5 million. Silta operated a salvage business, wherein he would purchase equipment and resell it for a profit. Often he would have third-party buyers lined up before he bought the equipment from Cliffs. If the equipment could not be sold in operable condition, Silta would dismantle it and sell it as scrap metal. DeVaney and Silta had a good working relationship, and DeVaney would sometimes consult Silta about the value of an item he intended to sell.

The transaction giving rise to this appeal occurred in June 2004. Silta approached DeVaney and proposed purchasing 248 industrial circuit breakers that were located throughout the mine and used for operating high voltage machinery. The discussion of the sale was brief. Neither party knew exactly what the breakers were worth, and both DeVaney and Silta were under the impression that the breakers contained asbestos that needed to be abated. Silta offered ten dollars for each of the 248 breakers, and DeVaney immediately accepted without making a counteroffer or conducting any inquiry regarding the breakers' resale value. Silta later stated that although he did not know the value of the breakers, he was sure he would not lose money at that price. DeVaney, on the other hand, explained that he was happy to have someone else take care of the asbestos issue. Silta wrote Cliffs a check for $2,480 and DeVaney typed a sales invoice stating that Silta had purchased 248 "MS13 Asbestos containing breakers." The invoice also stated that "[p]ayment or terms for payment must be completed within 30 days of the Invoice date or the Sales Order will be voided."

-3-

Nineteen months elapsed between the time of the sale and Silta's first attempt to move the breakers. Throughout that time, Silta was continuously present at the mine, performing a variety of tasks and purchasing other equipment. The breakers remained undisturbed and unnoticed until January 2006, when DeVaney told Silta to remove his equipment from the mine because of an impending sale of the property to a third party, PolyMet Mining, Corp. (PolyMet). Later that month, Silta presented his sales invoice and attempted to move the breakers, but Cliffs told Silta that the breakers had been sold to PolyMet, along with a mining facility that Polymet had purchased. Cliffs thereafter sent Silta a $2,480 refund check, which Silta refused, insisting that he wanted the breakers. Cliffs continued to reject Silta's claim, arguing that he had abandoned the breakers by not removing them at an earlier date. Silta subsequently learned that eighty-four of the breakers were on property that PolyMet had not purchased, and he filed a notice of *lis pendens* to prevent Cliffs from disposing of those breakers. Notwithstanding this notice, Cliffs sold the remaining breakers (as part of a sale of the facility in which they were housed) to another company that eventually scrapped the breakers for recycling.

By the time the case went to trial, both Silta and Cliffs had discovered that the breakers contained only a small quantity of non-friable asbestos that did not require abatement. In addition, Silta introduced evidence that the breakers had substantial value. He cited several trade journals indicating that similar breakers sold for between $23,000 and $65,000 each, and he pointed to the fact that PolyMet was apparently using the breakers to operate mining equipment at the Hoyt Lakes facility. A former Cliffs electrician who had worked at the mine for thirty-five years testified that the breakers were in excellent condition and could command a price of $24,000 to $32,000 apiece.

Cliffs countered that Silta had abandoned the breakers by leaving them on Cliffs' property for nineteen months. Alternatively, Cliffs argued that Silta's failure to abate the asbestos or remove the breakers was a material breach of contract that

excused its own performance. Cliffs also maintained that, if it had breached the agreement, the proper measure of Silta's damages was the scrap value of the breakers—approximately $500 per breaker—because the parties had not contemplated that the breakers might be resold. The jury concluded that Cliffs had breached the contract, and it awarded Silta $27,500 for each of the 248 breakers. The district court denied Cliffs' post-trial motion for judgment as a matter of law, a new trial, or remittitur; and it added prejudgment interest of $509,166.25, for a total judgment of $7,329,166.25.

## II.

Cliffs first argues that the district court erred by submitting a jury instruction that incorrectly explained its material breach defense. We review the district court's ruling on a jury instruction for abuse of discretion. Bass v. Flying J, Inc., 500 F.3d 736, 739 (8th Cir. 2007). The focus of our analysis is "whether the instructions, taken as a whole and viewed in light of the evidence and applicable law, fairly and adequately submitted the issues in the case to the jury." Id. (quoting Wilson v. City of Des Moines, 442 F.3d 637, 644 (8th Cir. 2006)). We will reverse only if an instructional error has affected a party's substantial rights. Id.

Instruction No. 20 explained the law governing Cliffs' material breach defense as follows:

> As a general rule, a material breach of contract by one party excuses performance by the other. A breach of contract is material if it frustrates a fundamental purpose of the contract. Materiality is determined by many factors: 1) the extent to which the injured party will be deprived of the benefit which he reasonably expected; 2) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived; 3) the extent to which the party failing to perform or to offer to perform will suffer forfeiture; 4) the likelihood that the party failing to perform or to offer to perform will cure his failure,

taking account of all the circumstances including any reasonable assurances; and 5) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing. Termination of a contract usually requires that reasonable notification be received by the other party.

Both parties agree that Minnesota law governs this case and that, setting aside the final sentence, the instruction correctly stated the law. Cliffs argues, however, that the language in the last sentence improperly conflates two distinct concepts—termination of a contract and prior breach as a justification for nonperformance.

Cliffs objected to the addition of the termination language on the ground that it was not arguing that the contract had been terminated, but rather that Silta had either materially breached the agreement or abandoned the breakers.[4] Silta contends that the termination language was supported by Minn. Stat. section 336.2-309(3), which provides that termination of a contract by one party "requires that reasonable notification be received by the other party." But the termination discussed in that statute is defined elsewhere as an act that "occurs when either party pursuant to a power created by agreement or law puts an end to the contract otherwise than for its breach." Id. § 336.2-106(3). A party may terminate a contract even when the other party has not breached, a distinction making notice particularly important. See Heating & Air Specialists, Inc. v. Jones, 180 F.3d 923, 933 (8th Cir. 1999) (citing Int'l Therapeutics, Inc. v. McGraw-Edison Co., 721 F.2d 488, 492 (5th Cir. 1983)); cf. Mott Equity Elevator v. Svihovec, 236 N.W.2d 900, 908-09 (N.D. 1975) (addressing the same UCC provisions and concluding that notice is not required when a contract is justifiably canceled rather than terminated). The fact that notice may be required for termination, therefore, does not establish that it was necessary here.

---

[4]Silta argues that we should review only for plain error because Cliffs' objection to the instruction lacked adequate specificity. Having reviewed the record, we agree with the district court that the issue was properly preserved.

Cliffs argued that its nonperformance was justified because Silta materially breached the contract by failing to remove the breakers or abate the asbestos. Under Minnesota law, a material breach by one party may excuse the performance of another. See, e.g., MTS Co. v. TAIGA Corp., 365 N.W.2d 321, 327 (Minn. Ct. App. 1985) ("A rule in the law of contracts is that a party cannot raise to its advantage a breach of contract against another party when it has first breached the contract itself."); see also Distronics Corp. v. Roberts-Hamilton Co., 575 F. Supp. 275, 277 (D. Minn. 1983) (applying Minnesota law and holding that a plaintiff's material breach of contract justifies a defendant's non-performance). In some instances, Minnesota courts have found that the defendant's failure to give notice of the breach eliminates this defense. See, e.g., Willmus v. Jordan & Sons, Inc., 178 N.W.2d 884, 887 (Minn. 1970). But Silta has not cited, and we have not found, a Minnesota case applying the same type of broad notice requirement found in Minn. Stat. section 336.2-309(3) to a defense based on the plaintiff's material breach of contract. Thus, while notice was a relevant issue—and certainly one factor to be considered in analyzing the materiality of the alleged breach—the district court erred in instructing the jury that notice was usually required.

Reversal is not warranted here, however, because the instructional error did not affect Cliffs' substantial rights. The reference to termination and notice was a technical error that, at most, may have caused the jury to give added attention to the issue of notice. Cliffs argues that the instruction was prejudicial because it was undisputed that Cliffs did not provide notice to Silta prior to his attempt to remove the breakers. Cliffs also contends that Silta's counsel exacerbated the harm by directing the jury's attention to the notice language. But the offending phrase must be viewed in the broader context of the entire trial, including the other instructions given to the jury. Instruction No. 17, which defined the concept of breach, did not mention the issue of notice. The jury was also correctly instructed that many factors are relevant to the materiality of a breach, and the interrogatory submitted to the jury simply asked whether Silta materially breached the contract by failing to remove the breakers within

a reasonable time. Taking into consideration all of the circumstances in which the instruction was given, it seems likely that the jury was guided by common sense and not myopically focused on a single stray phrase. Cf. Boyde v. California, 494 U.S. 370, 381 (1990) ("Jurors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might. Differences among them in interpretation of instructions may be thrashed out in the deliberative process, with commonsense understanding of the instructions in the light of all that has taken place at the trial likely to prevail over technical hairsplitting.").

The record also reveals that Cliffs' prior breach defense was unlikely to succeed, even in the absence of the challenged language. There are two significant problems with Cliffs' contention that Silta breached the contract by failing to remove the breakers or abate the asbestos. First, the contract itself does not state that Silta had an obligation to abate the asbestos or remove the breakers within a certain period of time.[5] Cliffs argues that the obligation was implicit in the phrase "Asbestos containing breakers." According to Cliffs, that language implies that asbestos abatement was the essential part of Silta's payment for the breakers, and the contract states that payment must be made within thirty days of the invoice date. Cliffs creatively reads the two provisions together to give Silta thirty days to remove the breakers or abate the asbestos. This interpretation, however, conflicts with a straightforward reading of the contract.

---

[5]There is some dispute over whether Silta received a second document entitled "Terms and Conditions of Sale," which stated that "[t]he Purchaser is responsible for making arrangements for the timely removal of the material or equipment from the Company's property." Silta testified that the document was not part of the contract, and DeVaney testified that he could not say whether it was included. On this evidence, the jury probably determined that the separate term sheet was not part of the contract. In any event, the inclusion of that single sentence, within a full page of small-print terms, does not establish that removal was a material part of the agreement.

Moreover, both parties now acknowledge that no asbestos abatement was necessary. Trial testimony confirmed that the breakers did not cause Cliffs any harm as they sat idle within the mine and there was no need for them to be moved; indeed, they were apparently unnoticed. Silta's alleged breach of contract, therefore, did not injure Cliffs. On this record, it is difficult to see how a properly instructed jury could find that the breach was material. Silta's delay in seeking to remove the breakers did not leave Cliffs without any possible defense. Rather, it seems to us that abandonment is the better lens through which to view this case. Cliffs argued abandonment as an alternative defense, and the jury was properly instructed on that theory. Accordingly, we conclude that the error in the instruction was harmless.

## III.

Cliffs also contends that the contract was invalid under the doctrine of mistake, an argument that it raises for the first time on appeal. Although Cliffs maintains that this issue was tried by implied consent, our review of the record convinces us otherwise. At trial and in its post-trial motion for judgment as a matter of law, Cliffs argued that DeVaney expected Silta to scrap, rather than resell, the breakers. The focus of these arguments was on whether it was foreseeable that Cliffs would be liable for the fair market value of the breakers. The issue was presented as a question of damages; Cliffs did not argue that the contract was void or voidable due to mistake. Nor is there any indication that Silta or the district court considered this theory.[6]

---

[6]Cliffs cites Allegheny Int'l, Inc. v. Snyder, 954 F.2d 167 (3d Cir. 1992), for the proposition that the issue of mistake may be tried by consent even when the theory is not specifically mentioned. In Allegheny, the court determined that the defendant made the necessary argument while relying on incorrect terminology. Id. at 176-77. The court also observed that the district court apparently had considered the defense of mistake. Id. at 176. Here, Cliffs failed to make the underlying argument that the contract was invalid. Moreover, there is no indication that the district court ever considered whether the contract was voidable under a mistake theory. Allegheny is thus inapposite.

Accordingly, we decline to address these arguments. See <u>Shanklin v. Fitzgerald</u>, 397 F.3d 596, 601 (8th Cir. 2005) ("Absent exceptional circumstances, we cannot consider issues not raised in the district court.").

IV.

Finally, Cliffs argues that the damage award was disproportionate as a matter of law. Cliffs cites the Restatement (Second) of Contracts section 351(3), which provides that a court "may limit damages for foreseeable loss . . . if it concludes that in the circumstances justice so requires in order to avoid disproportionate compensation." Cliffs also cites the following language in comment f to section 351:

> There are unusual instances in which it appears from the circumstances either that the parties assumed that one of them would not bear the risk of a particular loss or that, although there was no such assumption, it would be unjust to put the risk on that party. One such circumstance is an extreme disproportion between the loss and the price charged by the party whose liability for that loss is in question. The fact that the price is relatively small suggests that it was not intended to cover the risk of such liability. Another such circumstance is an informality of dealing, including the absence of a detailed written contract, which indicates that there was no careful attempt to allocate all of the risks.

Cliffs points to the fact that the damages awarded in this case were 2,750 times the $2,480 contract price. Cliffs argues that it did not contemplate this type of liability when it sold Silta the breakers, and it contends that the damages should be limited in the interest of justice.

There are apparently no Minnesota cases adopting or applying section 351(3). Conceding the dearth of precedent on this issue, Cliffs alternatively asks us to certify to the Minnesota Supreme Court the question of whether Minnesota courts would adopt that provision. Certification is unnecessary, however, because the district court

-10-

assumed that section 351(3) was applicable and simply chose not to reduce the damage award in this particular case. The permissive language in section 351(3) leaves damage limitation within the sound discretion of the district court, and we do not believe that the district court abused its discretion.[7]

Courts have primarily applied section 351(3) to limit consequential, as opposed to direct, damages. See M. N. Kniffin, A Newly Identified Contract Unconscionability: Unconscionability of Remedy, 63 Notre Dame L. Rev. 247, 251 (1988) ("Rarely has the scope of section 351(3) been interpreted as encompassing general damages, which are based on the market value of the promised performance, as distinguished from consequential damages that result indirectly from failure to perform and to which the section clearly applies."); see also Larry T. Garvin, Disproportionality and the Law of Consequential Damages: Default Theory and Cognitive Reality, 59 Ohio St. L.J. 339 (1998) (analyzing section 351(3) exclusively in the context of consequential damages). This application accords with the goal of section 351(3), which is to avoid placing liability on a party that has not chosen to bear certain risks. When the risks were or should have been anticipated, courts generally will not interfere simply because the damages are disproportionate to the contract price. For example, in International Ore & Fertilizer Corp. v. SGS Control Services, Inc., 38 F.3d 1279 (2d Cir. 1994), the Second Circuit upheld a damage award that was more than 4,000 times the contract price because the parties were sophisticated and the defendant's low fee "hardly suggest[ed] that the parties failed to contemplate" the defendant bearing the risk of the damages from its breach. Id. at 1284. In the present case, there is evidence suggesting that Cliffs should have

---

[7]In Walser v. Toyota Motor Sales, U.S.A., Inc., 43 F.3d 396 (8th Cir. 1994), we interpreted nearly identical language in Restatement (Second) section 90 as placing the damage limitation decision within the district court's discretion. Id. at 401. Cliffs contends that our review should be *de novo*, because Minnesota courts treat the related concept of unconscionability as a question of law. In that context, however, the standard of review is statutorily mandated; here it is not. See Minn. Stat. § 336.2-302.

contemplated the direct consequence—that is, liability for fair market value—of refusing to allow Silta to take the breakers.

Cliffs contends that when DeVaney sold the breakers to Silta, DeVaney did not realize how much they were worth, and Cliffs also argues that it expected Silta to scrap the breakers rather than resell them. The evidence indicates that the breakers were worth relatively little to Cliffs at the time it contracted with Silta. But as the district court noted, the discounted price at which Cliffs sold the breakers was not particularly unusual. Cliffs liquidated a great deal of mine equipment at fire sale prices; in one instance, Cliffs sold $450,000 worth of equipment for $1,200 just to get rid of it. On the question of whether Silta planned to scrap or salvage the breakers, there was conflicting evidence from which the jury could have concluded that both DeVaney and Silta contemplated resale.

It is unclear how Cliffs valued the breakers after the transaction with Silta. Cliffs did not introduce evidence of the fair market resale value of the breakers, and it did not provide information about its transaction with PolyMet. On this record, it is possible that the breakers suddenly became much more valuable to Cliffs when PolyMet entered the picture. In the absence of any evidence, we cannot be certain that limiting Silta's damages would not confer a benefit on Cliffs for breaching its contract with Silta. Moreover, some of the damages in this case were self-inflicted, because Cliffs disposed of eighty-four of the breakers after it knew that ownership of that property was disputed.

Cliffs is a sophisticated commercial entity that entered into hundreds of contracts like the one here. Its agent, DeVaney, had worked in the mining industry for thirty years, and DeVaney's prior experience as a manager of purchasing was directly relevant to the task of liquidating the mine. Accordingly, we cannot say that the district court abused its discretion in refusing to limit the damages.

The judgment is affirmed.

_____

-12-