# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 09-1423

_____

M.M. Silta, Inc.,                  *

                                          *

         Appellant,             *    Appeal from the United States

                                          *    District Court for the

     v.                                 *    District of Minnesota.

                                          *

Cleveland Cliffs, Inc., Cliffs Mining   *

Company; Cliffs Erie, L.L.C.,       *

                                          *

         Appellant.            *

_____

Submitted: February 10, 2010
Filed: August 17, 2010

_____

Before WOLLMAN, HANSEN, and MELLOY, Circuit Judges.

_____

WOLLMAN, Circuit Judge.

M.M. Silta, Inc. (Silta) appeals from the district court's[1] dismissal of its breach of contract action and related claims against Cleveland Cliffs, Inc. and its subsidiaries (collectively, Cliffs). Because a jury in a previous action found that Cliffs properly terminated the parties' agreement, and because we conclude that the contract unambiguously precludes the post-termination obligations on which Silta's claims are premised, we affirm.

_____

[1]The Honorable Michael J. Davis, Chief Judge, United States District Court for the District of Minnesota.

## I. Background

Cliffs is an international iron ore producer with mining operations in Michigan, Minnesota, and eastern Canada. In early 2002, Cliffs began liquidating the assets of a Hoyt Lakes, Minnesota, taconite mine that it had purchased from a bankrupt competitor. Melvin Silta, the owner and primary employee of M.M. Silta, Inc., learned of the liquidation and sought the opportunity to perform salvage and reclamation work at the Hoyt Lakes facility. Between 2002 and 2006, Silta engaged in a variety of tasks at the mine and entered into agreements with Cliffs for the purchase of used mining equipment. One such agreement was the subject of a prior appeal, in which we affirmed a $7.3 million jury verdict in Silta's favor. See M.M. Silta, Inc. v. Cleveland Cliffs, Inc., 572 F.3d 532 (8th Cir. 2009).

### A. The Reclamation Services Agreement

The contract giving rise to this appeal concerned the reclamation of iron ore remaining from when the mine was operational. Melvin Silta believed that the leftover ore would be marketable, and he proposed entering into an agreement with Cliffs to sell the material to third parties. Accordingly, in 2004 Silta and Cliffs signed a Reclamation Services Agreement that called for Silta to excavate, screen, and load the material and for Cliffs to attempt to find a buyer. The agreement further provided that Cliffs would immediately pay Silta a non-refundable advance of $300,000 and thereafter continue to pay Silta weekly non-refundable advances of $100,000 while Silta performed the work. Upon the sale and shipment of the reclaimed ore, Cliffs agreed to pay Silta an additional amount—ranging from $16.00 to $18.50 per net ton—but only to the extent that the additional sum exceeded the advances that Silta had already been paid. The contract did not require Cliffs to sell any particular amount of the material but instead permitted Cliffs to terminate the contract if it made a good faith determination that the ore could not be economically sold. The relevant termination provisions read as follows:

## TERM AND TERMINATION

2.1 The Services to be performed and related rights granted hereunder shall commence on the Effective Date of this Agreement and shall terminate upon the earlier of (a) such time when the Product can no longer be economically sold by [Cliffs] as determined by [Cliffs] or (b) November 30, 2006 ("Term"). Upon termination of this Agreement the parties shall discuss the potential sale of any unsold Product, provided, however, that any future agreement relating to unsold Product shall only be effective upon the mutual agreement of the parties as evidenced by a separate written agreement.

2.2 All of the covenants and agreements set forth in this Agreement shall survive the expiry of the Term.

Throughout 2004 and 2005, Silta reclaimed leftover ore and was paid advances totaling $4.8 million. Sale of the material, however, proved difficult and controversial. In October 2005, having sold only a small portion of the reclaimed ore, Cliffs sent Silta a letter formally terminating the agreement. The letter referred to Cliffs' termination power pursuant to Section 2.1 and asserted that the ore could no longer be economically sold. It stated that Cliffs would discontinue its advance payments to Silta and requested that Silta cease the reclamation work. In addition, the letter provided that:

Cliffs realizes that it has an ongoing obligation to Silta with respect to § 1.2 of the Agreement, and that, if and when the remaining Product is sold, amounts may be owed to Silta. If a buyer is located, Cliffs will notify Silta of the sale of the Product and shall net out what has already been paid to Silta with what is owed. Until such time, no further payments shall be made to Silta as either an advance or on the sale of the Product.

-3-

## B. The 2008 Trial

Two years later, with the reclaimed ore still unsold, Silta sued Cliffs, arguing that Cliffs had acted in bad faith in failing to sell the material. During the jury trial in 2008, both sides presented extensive testimony about the value of the unsold ore and Cliffs' efforts to find a buyer. Cliffs argued that the poor quality and irregular quantity of the reclaimed material made it difficult to sell. Silta maintained that the international market for iron ore was strong and that Cliffs had ulterior motives for terminating the agreement. Silta also claimed that if the remaining material was sold, Cliffs would owe Silta approximately $3.2 million over and above the advance payments that Cliffs had already made.

In the course of explaining the termination decision, several witnesses for Cliffs referred to the October 2005 termination letter or other communications in which Cliffs had indicated its intent to pay Silta if the reclaimed ore was sold. For example, Lee English, Cliffs' Director of Sales and Marketing, provided the following testimony in response to questions about the termination:

> Q: And did you agree that it didn't make sense to continue putting up more material?
>
> A: Yes.
>
> Q: And the [October 2005 termination] letter indicates that—acknowledging to the Silta company that if, and when, sales were made in the future, payment would be made?
>
> A: Yes, that's the plan that we had.
>
> Q: And was that your understanding of what Cliffs' obligations were under the contract, that if the material is sold and would get over that credit balance, that further payment is due?
>
> A: Yes.

-4-

Cliffs' trial counsel also recurred to this issue in his closing argument, describing the events that surrounded the termination of the agreement:

> And [Silta] continues, in 2006, with persistent—that's his word, "persistent"—phone calls to Lee English and others at Cleveland-Cliffs. He tells you that he's angry, and that these are not pleasant calls, and that they're repeated and persistent. And he's continually, by his own testimony, every time he calls, he's reassured that if, and when, the material sells, he's going to get paid.

The jury ultimately returned a verdict in favor of Cliffs, finding that Cliffs' termination of the contract was not a breach of its agreement with Silta. Silta did not appeal the jury's verdict.

## C. Silta's Current Allegations

Several months after the jury trial, Silta filed another complaint, claiming that Cliffs had again breached the Reclamation Services Agreement by either selling the reclaimed ore and not paying Silta, or by not attempting to sell the material in good faith. Silta alternatively alleged that Cliffs had sold only enough of the ore to eliminate the $4.8 million credit balance, rather than selling everything that had been excavated. Silta's renewed claims were premised on its belief that, even after termination, Cliffs was bound under the parties' original agreement to sell the unsold material and pay Silta according to the contract. Silta's amended complaint included claims for (1) breach of contract; (2) breach of the implied duty of good faith and fair dealing; (3) unjust enrichment and a related claim for an accounting or constructive trust; and (4) declaratory judgment.[2]

---

[2]Silta also included a claim alleging a breach of fiduciary duty. The district court concluded, however, that Silta was barred from asserting this claim because Silta voluntarily dismissed a similar claim during the 2008 trial. Silta has not raised this

The district court granted Cliffs' motion to dismiss Silta's amended complaint on all counts. The court initially determined that res judicata barred Silta from asserting that Cliffs had either not terminated the agreement or had terminated it in bad faith. Thus, the court recognized that the dispositive issue was whether the contract imposed any post-termination obligations on Cliffs to sell the material, pay Silta, or keep Silta informed about the status of the unsold product. Concluding that the clear language of the contract precluded such post-termination obligations, the district court found that Silta's claims failed as a matter of law.

## II. Analysis

We review *de novo* the district court's dismissal of an action for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). O'Neil v. Simplicity, Inc., 574 F.3d 501, 503 (8th Cir. 2009). In reviewing the sufficiency of a complaint, we accept the plaintiff's factual allegations as true, but the allegations must supply facts sufficient to state a claim that is plausible on its face. Id. (citing Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). Where, as here, the claims relate to a written contract that is part of the record in the case, we consider the language of the contract when reviewing the sufficiency of the complaint. See Fed. R. Civ. P. 10(c); Blankenship v. USA Truck, Inc., 601 F.3d 852, 853 (8th Cir. 2010). The parties agree that this case is governed by Minnesota law.

We agree with the district court that any argument that Cliffs improperly terminated the agreement is barred by res judicata. Cliffs' good-faith termination of the Reclamation Services Agreement was established by a prior jury verdict that Silta did not appeal, and thus that issue cannot be relitigated. See Costner v. URS Consultants, Inc., 153 F.3d 667, 673 (8th Cir. 1998) (explaining the application of res judicata). Accordingly, the central question in this case is whether the parties'

issue on appeal.

agreement precludes the post-termination obligations on which Silta's complaint is based.

"The construction and effect of a contract presents a question of law, unless an ambiguity exists." Brookfield Trade Ctr. v. County of Ramsey, 584 N.W.2d 390, 394 (Minn. 1998). A contract is ambiguous if it is susceptible to more than one reasonable interpretation based on its language alone. In re SRC Holding Corp., 545 F.3d 661, 666 (8th Cir. 2008) (applying Minnesota law). "Extrinsic evidence of the parties' subjective intent cannot be used to create contractual ambiguity where none exists on the face of the [agreement]." Id. (citing In re Hennepin County 1986 Recycling Bond Litig., 540 N.W.2d 494, 498 (Minn. 1995)). In gauging ambiguity, courts must read contract terms in the context of the entire agreement, and the terms should not be construed in a manner that leads to a harsh and absurd result. Brookfield Trade Ctr., 584 N.W.2d at 394. A contract should also be interpreted in a manner that gives meaning to all of its provisions. Id.

The gravamen of Silta's complaint is that, notwithstanding the jury's determination that Cliffs terminated the agreement in good faith, Cliffs was required to continue indefinitely making a good faith effort to sell the unsold ore and to pay Silta according to the contract. Silta further contends that its argument is bolstered by various statements that Cliffs made throughout the earlier litigation which, according to Silta, indicated Cliffs' belief that it was obligated to make additional payments when the reclaimed ore was sold.

A. The Contract Language

We conclude that Silta's claims are foreclosed by the plain language of the parties' agreement. Under Section 2.1, the "[s]ervices to be performed and related rights granted" in the agreement were terminable upon Cliffs' determination that the product could no longer be economically sold. A straightforward reading of the contract makes clear that "services and related rights" included both Silta's

responsibility to reclaim the ore and Cliffs' obligation to sell the material and make additional payments. This interpretation is supported by the structure of the agreement, as the terms for both the services and payment rights are all included in Article 1 of the contract, which is entitled "SCOPE OF SERVICES." The remaining language in Section 2.1 provides further support for this position, stating that upon termination of the agreement "the parties shall discuss the potential sale of any unsold Product" and "any future agreement relating to unsold Product shall only be effective upon the mutual agreement of the parties as evidenced by a separate written agreement." Those statements clearly indicate that there were no post-termination obligations with respect to the unsold ore. The contract leaves open whether the parties would reach a separate agreement about what steps to take following termination.

Silta contends that the unambiguous language in Section 2.1 is clouded by the provision that immediately follows it in Section 2.2, which states that "[a]ll of the covenants and agreements set forth in this Agreement shall survive the expiry of the Term." According to Silta, that statement suggests that its right to additional payments survives the termination of the agreement. We disagree. Section 2.1 speaks unequivocally about the effect of termination on any unsold material. To adopt Silta's interpretation of the contract language would require us to ignore the clear meaning of Section 2.1. Further, under Silta's reading of the agreement, Section 2.2 has the practical effect of committing Cliffs indefinitely to trying to sell the unsold ore—an anomalous result given that the immediately preceding provision allows Cliffs to determine that the product cannot be economically sold. The better interpretation of Section 2.2, and the one adopted by the district court, is that the surviving "covenants and agreements" include the obligations that necessarily would continue even if the product could not be sold. The latter part of the contract includes terms governing asset ownership, taxes, liens, insurance, and indemnification. The contract obligated Silta, for example, to indemnify Cliffs for any lawsuits arising out of Silta's work at the mine. Accordingly, under Section 2.2, Silta's duty to indemnify Cliffs would continue post-termination. Similarly, the provisions regarding asset ownership, taxes,

-8-

and liens would survive. This reading of Section 2.2 harmonizes all of the various provisions in the agreement and it is fully consistent with the unambiguous termination language in Section 2.1.

Silta argues that it is unreasonable to interpret the contract to eliminate its right to additional post-termination payments. Silta's position, however, is actually the less reasonable interpretation. As discussed above, the agreement provided that Silta would receive weekly advances of $100,000 while performing the work. Silta was also entitled to additional payment upon the shipment of the material, but only to the extent that the additional amount due exceeded the advances that had already been paid. The nature and structure of the agreement reflected an attempt to balance Silta's desire for guaranteed payment against Cliffs' uncertainty that it could successfully market the reclaimed ore. Given these circumstances, it is hardly surprising that the contract did not guarantee that any particular amount of the material would be sold or that Silta would receive any additional post-termination payments.

On the other hand, Silta's interpretation leads to an absurd result, in which Cliffs would face perpetual contract liability until it had sold all of the reclaimed ore. The present lawsuit illustrates the point. After Cliffs terminated the agreement in 2005, the parties engaged in three years of litigation over whether the termination had been in good faith, which culminated in the jury trial described above.[3] The jury found that Cliffs had properly terminated the agreement. Several months later, however, Silta filed this lawsuit alleging that Cliffs had acted in bad faith after the trial in either failing to sell the material or pay Silta under the terms of the contract. Under Silta's reading of the agreement, it would apparently be permitted to continue

_____

[3]The three-year period of time is significant. In arguing that the interpretation we adopt here is unreasonable, Silta contends that it would have been paid in excess of $3 million (its calculation based on the sale of all the reclaimed ore) if the material had been sold the day before Cliffs' termination letter, and nothing if the material had been sold the day after. This scenario is implausible, as such conduct would have been prima facie evidence of bad faith termination.

litigating this matter indefinitely. It is difficult to imagine why a party would willingly subject itself to such open-ended liability over an uncertain business endeavor. Indeed, the language in the termination provision reflects an attempt to avoid such a situation. Cliffs paid Silta $4.8 million in non-refundable advances while the work was being performed, and a jury determined that Cliffs properly terminated the agreement based on economic considerations. Under the only reasonable interpretation of the contract's language, Cliffs has fulfilled its obligations to Silta and has no remaining duty to sell the reclaimed material or make additional payments.

## B. Extrinsic Evidence of Cliffs' Subjective Intent

In addition to its textual arguments, Silta points to extrinsic evidence, claiming that Cliffs' statements in the termination letter and subsequent litigation established Cliffs' subjective intent to pay Silta upon the sale of the reclaimed ore. Evidence of the parties' subjective intent, however, cannot be used to create an ambiguity where the contract is clear on its face. See In re SRC Holding Corp., 545 F.3d at 666; Instrumentation Servs., Inc. v. Gen. Res. Corp., 283 N.W.2d 902, 908 (Minn. 1979) (holding that ambiguity cannot be created through extrinsic oral testimony). As just discussed, Silta's contract claim is foreclosed by the plain language of the agreement itself. The extrinsic evidence is thus irrelevant to our analysis.

Moreover, even if the extrinsic evidence were relevant, that evidence does not establish Cliffs' subjective intent as indisputably as Silta suggests. As noted above, the termination letter included the observation that "Cliffs realizes that it has an ongoing obligation to Silta . . . and that, if and when the remaining Product is sold, amounts may be owed to Silta." At different points during the trial, Cliffs' counsel and witnesses also referred to the termination letter or similar assurances that had been given to Silta. Cliffs' counsel stated, for example, that "every time [Melvin Silta had called in 2006], he's reassured that if, and when, the material sells, he's going to get paid." Silta contends that these statements clearly establish that the parties understood that Silta's payment rights would survive termination of the contract. We disagree.

Although several of the statements indicated that Cliffs intended to pay Silta if the product was sold, the statements were largely focused on the termination letter and the events that followed shortly thereafter. Contrary to Silta's contention, none of the statements unequivocally established that Cliffs believed it was perpetually bound to sell the material and make additional payments, even after exercising its right to terminate the agreement in good faith.[4]

Silta alternatively argues, for the first time on appeal, that the extrinsic evidence of Cliffs' statements satisfies the requirement in Section 2.1 for a separate written agreement regarding unsold product. Although Silta's complaint alleged that Cliffs had acknowledged an obligation to pay Silta when the reclaimed ore was sold, Silta did not argue in the district court that these statements themselves constituted a separate agreement. The district court noted that "Silta did not allege the existence of a post-termination written agreement concerning unsold Product." As we pointed out in a prior opinion involving these same parties, we ordinarily do not consider arguments raised for the first time on appeal. See M.M. Silta, Inc., 572 F.3d at 538-39; see also Gregory v. Dillard's Inc., 565 F.3d 464, 473 (8th Cir. 2009) (en banc) ("A district court . . . is not required to divine the litigant's intent and create claims that are

---

[4]For this reason, among others, we likewise reject Silta's argument that Cliffs is barred by the doctrine of judicial estoppel from arguing that it has no post-termination obligation to sell the reclaimed ore. Judicial estoppel is an equitable doctrine that courts may apply to bar a party from asserting a position that is "clearly inconsistent" with an earlier argument that it persuaded a court to accept. New Hampshire v. Maine, 532 U.S. 742, 750 (2001). Whatever differences may exist between parts of the trial testimony and Cliffs' current interpretation of the contract, Cliffs' positions are not so clearly inconsistent as to support application of judicial estoppel. Further, the district court was uniquely situated to address this issue, having presided over the 2008 trial, and it found Silta's argument unpersuasive, a determination that we conclude did not constitute an abuse of the district court's discretion. See Stallings v. Hussmann Corp., 447 F.3d 1041, 1046 (8th Cir. 2006) (noting that the district court's judicial estoppel determination is reviewed for abuse of discretion).

not clearly raised, and it need not conjure up unpled allegations to save a complaint.") (internal quotations and citation omitted). Even if we were to consider this argument, the statements are insufficient to establish the existence of a separate contract. We therefore conclude that the district court did not err in granting Cliffs' motion to dismiss Silta's claims for breach of contract.

## C. Silta's Additional Claims

We also conclude that the district court did not err in dismissing the remaining claims, all of which are based on Silta's belief that Cliffs failed to adhere to the original contract. Silta's claim for breach of the implied covenant of good faith and fair dealing, for example, requires a finding that Cliffs acted in bad faith in relation to an underlying contractual duty. See, e.g., In re Hennepin County 1986 Recycling Bond Litig., 540 N.W.2d at 503 ("In Minnesota, the implied covenant of good faith and fair dealing does not extend to actions beyond the scope of the underlying contract."); Sterling Capital Advisors v. Herzog, 575 N.W.2d 121, 125 (Minn. Ct. App. 1998) (explaining bad faith as "a party's refusal to fulfill some duty or contractual obligation based on an ulterior motive, not an honest mistake regarding one's rights or duties"). Similarly, Silta cannot maintain its unjust enrichment claim because "equitable relief cannot be granted where the rights of the parties are governed by a valid contract." U.S. Fire Ins. Co. v. Minn. State Zoological Bd., 307 N.W.2d 490, 497 (Minn. 1981). Here, the contract provided both the payment terms and the conditions under which Cliffs could terminate the agreement. That the contract was properly terminated, as determined by the jury in the 2008 trial, does not make it any less dispositive with regard to the rights and duties of the parties. Silta cannot claim that Cliffs was unjustly enriched when Cliffs acted in accordance with the parties' agreement. For the same reason, Silta's remaining equitable claims for accounting and constructive trust also fail.

-12-

## III. Conclusion

The judgment is affirmed.

MELLOY, Circuit Judge, Dissenting.

I agree with the majority that "the central question in this case is whether the parties' agreement precludes the post-termination obligations on which Silta's complaint is based." Majority Op., p. 7, supra. Unlike the majority, though, I would hold that the Reclamation Services Agreement ("the Agreement") is ambiguous with regard to those obligations. I do not believe that "Services to be performed and related rights granted" in Section 2.1 "clearly indicate[s] that there were no post-termination obligations with respect to the unsold ore." Id. at p. 8. Indeed, no term in the Agreement specifically addresses whether Cliffs has a post-termination obligation to pay Silta for the eventual sale of ore that Silta reclaimed under the Agreement. That alleged payment obligation could reasonably be construed as a "related right" that expired upon termination under Section 2.1 or as an "agreement" that survived Cliffs' termination pursuant to Section 2.2. Neither interpretation is foreclosed by language in the Agreement, and neither interpretation is unreasonable.

Furthermore, the second sentence in Section 2.1 does not support Cliffs' interpretation of the Agreement. To be sure, that sentence contemplates the possibility of Silta and Cliffs reaching a separate agreement about actions with regard to reclaimed but unsold ore. That provision is silent, however, as to whether the payment obligations from Article 1 apply to "the potential sale of any unsold Product." In other words, although the second sentence in Section 2.1 contemplates a post-termination scenario, it says nothing about the rights at issue here—i.e., whether Cliffs must pay Silta if it sells the reclaimed ore.

If anything, the second sentence in Section 2.1 cuts against Cliffs' interpretation of the Agreement. Cliffs claims, and the majority agrees, that Silta has no post-

-13-

termination interest in the ore that it reclaimed—i.e., Cliffs owed no duty to pay Silta after the Agreement was properly terminated. Instead, the Agreement (*via* Section 2.1) merely obligated Cliffs to *discuss* the potential sale of unsold ore with Silta. But if Silta has no right to payment from the potential sale of the unsold ore, what is there for the parties to discuss? Under Cliffs' interpretation, the duty to discuss appears meaningless or illusory. But if *both* Cliffs and Silta have an interest in the unsold ore, then neither party could sell or dispose of the ore without consent from the other party. In this latter scenario, the duty to discuss would be meaningful and the proviso about a future agreement would be sensible. Thus, the second sentence of Section 2.1 arguably supports Silta's interpretation.

The majority also finds that Silta's interpretation is less reasonable because the "nature and structure of the agreement reflected an attempt to balance Silta's desire for guaranteed payment against Cliffs' uncertainty that it could successfully market the ore." Id. at p. 9. I disagree with this reasonableness analysis for two reasons. First, the majority only draws an inference in favor of the moving party (Cliffs) when conflicting reasonable inferences are available. See Braden v. Wal-Mart Stores, Inc., 588 F.3d 585, 595 (8th Cir. 2009) (reversing a district court's dismissal because the court ignored reasonable inferences in the non-movant's favor and drew inferences in the movant's favor). To be sure, one could reasonably interpret from the advance-payments provision that Silta was concerned with guaranteed payments. However, the advance-payments provision could also have been important for Silta to avoid the up-front costs of excavation and screening the ore. Furthermore, one could draw a conflicting inference from the aspect of Silta's compensation that was tied to the amount of ore it excavated, screened, and loaded. This latter compensation method shows that Silta desired to be paid based on the quantity of ore it reclaimed. And it is reasonable to believe that Cliffs accepted this output-based compensation structure, because Cliffs would benefit if Silta was motivated to reclaim as much ore as possible. However, the majority does not acknowledge these conflicting inferences regarding the parties' priorities and the nature of their compromise, instead putting all inferential weight on the guaranteed-payments provision.

-14-

Second, and more importantly, none of the available inferences resolve the dispositive question—whether the parties intended for Silta to be paid for the eventual sale of ore that it reclaimed prior to termination. Even if I accept the majority's inferences that Silta desired guaranteed payments and that Cliffs was uncertain about selling the ore, there is nothing to support the further inference that Silta valued guaranteed payments so much that it agreed to forego a post-termination right to payment if sale of the ore became economically viable. Because the language of the Agreement is not clear, I believe that it is the fact-finder's job to interpret the contract in light of *all* the extrinsic evidence. See Thomsen v. Famous Dave's of Am., Inc., 606 F.3d 905, 911 (8th Cir. 2010) ("Where contract terms are ambiguous, 'construction becomes a question of fact *unless extrinsic evidence is conclusive*.'" (quoting Martens v. Minn. Mining & Mfg. Co., 616 N.W.2d 732, 751 (Minn. 2000))). Notably, that would include the repeated statements from Cliffs' representatives that they intended to pay Silta if and when the reclaimed ore was sold.

Finally, the majority states that Silta's interpretation of the Agreement would impose perpetual contract liability on Cliffs. It would be an anomalous result, according to the majority, if Cliffs was obligated indefinitely to sell the unsold ore after it determined that the product cannot be economically sold. To the contrary, Silta only seeks to enforce a duty to attempt to sell the ore *in good faith*. See Am. Compl. ¶ 23 ("Defendants are not in good faith attempting to sell all of the Units"); see also Majority Op. p. 7, supra ("The gravamen of Silta's complaint is that . . . Cliffs was required to continue indefinitely making *a good faith effort* to sell the unsold ore and to pay Silta according to the contract.") (emphasis added). Silta does not allege that Cliffs has an *unconditional* duty to sell the ore. If the ore could not be sold economically—as the proof showed in the first trial—then Cliffs faces no liability by failing to sell the ore. But if sale of the ore becomes economically viable after the Agreement has been properly terminated, then Cliffs must make a good faith effort to sell the reclaimed ore. In my view, this result is not anomalous or unreasonable.

-15-

Even if I agreed that Cliffs has no duty to sell the ore, I would still dissent because Silta also alleges claims based on ore *that Cliffs has already sold*. Accepting the complaint's allegations as true, in 2008, Cliffs represented that it sold all of the reclaimed ore, but later said that it only sold enough to offset the advances paid to Silta. See Am. Compl. ¶¶ 21, 22, & 24. Apparently, Silta does not know whether Cliffs actually owes it money. It is possible that Silta was overpaid, as Cliffs suggests, but it also possible that Cliffs received a $3 million windfall when it sold all of the ore that Silta reclaimed. As I see it, these conflicting allegations and unknown facts support Silta's claim that Cliffs has an implied duty to account for the sales and communicate that accounting to Silta. See id. at ¶ 23 ("Defendants are not in good faith attempting to . . . properly account for the Units available to be sold."); id. at ¶ 27 ("Defendants have failed to inform Plaintiff of the terms of the sale of the Units."). Because no language in the Agreement unequivocally addresses that duty, this claim to account for ore actually sold should survive a motion to dismiss even if Cliffs owes no continuing duty to sell the reclaimed ore.

For the foregoing reasons, I respectfully dissent.

_____