# United States Court of Appeals
## For the Eighth Circuit

_____

No. 18-2121

_____

In re: Wholesale Grocery Products Antitrust Litigation

------------------------------

D&G, Inc., doing business as Gary's Foods; Blue Goose Super Market, Inc.;
Nemecek Markets, Inc.; Millennium Operations, Inc., doing business as Dick's
Market; Elkhorn-Lueptows, Inc.; Jefferson Lueptows, Inc.; East Troy Lueptows, Inc.,

*Plaintiffs - Appellants*,

v.

C&S Wholesale Grocers, Inc.,

*Defendant - Appellee*.

_____

Appeal from United States District Court
for the District of Minnesota - Minneapolis

_____

Submitted: October 15, 2019
Filed: April 27, 2020

_____

Before COLLOTON, BEAM, and KELLY, Circuit Judges.

_____

COLLOTON, Circuit Judge.

D&G, Inc., an independent grocery retailer, brought an antitrust suit against C&S Wholesale Grocers, Inc., on behalf of a class of grocery retailers. The retailers alleged that C&S agreed with another grocery wholesaler, SuperValu, Inc., not to compete for customers in certain geographical areas. A jury returned a verdict in favor of C&S. D&G appeals, arguing that the district court[1] erred in its instructions to the jury. We conclude that the instructions fairly and adequately submitted the issues, and we therefore affirm the judgment.

I.

C&S Wholesale Grocers, Inc., provides wholesale grocery services to grocery retail stores primarily in the northeastern United States. In 2003, C&S purchased substantially all the assets of Fleming, a nationwide grocery wholesaler, during Fleming's bankruptcy. C&S later entered into an asset exchange agreement with SuperValu, a grocery wholesaler headquartered near Minneapolis. C&S transferred Fleming's assets and customers located in the Midwest to SuperValu in exchange for SuperValu's assets and customers located in New England. C&S and SuperValu agreed not to supply the exchanged customers for two years after the sale and not to solicit the exchanged customers for five years after the sale.

This transaction prompted extensive antitrust litigation. Customers of both C&S and SuperValu sued the wholesalers, asserting that the written agreement and a separate unwritten understanding violated the Sherman Act, 15 U.S.C. § 1. The district court certified five classes of plaintiffs, all grocery retailers, who brought antitrust claims against C&S and SuperValu arising from the transaction. This court

---

[1]The Honorable Ann D. Montgomery, United States District Judge for the District of Minnesota.

has addressed other aspects of the litigation in three previous appeals. *See In re Wholesale Grocery Prod. Antitrust Litig.*, 946 F.3d 995 (8th Cir. 2019); *In re Wholesale Grocery Prod. Antitrust Litig.*, 752 F.3d 728 (8th Cir. 2014); *In re Wholesale Grocery Prod. Antitrust Litig.*, 707 F.3d 917 (8th Cir. 2013).

D&G, Inc., is an independent grocery store representing one of the classes that sued C&S. D&G and the class assert that the agreement between C&S and SuperValu was an illegal antitrust conspiracy. The class alleged that C&S violated the Sherman Act by agreeing with SuperValu to allocate customers and territories for full-line grocery wholesale goods and services, and that this anti-competitive conduct caused retailers to pay supracompetitive prices for wholesale goods and services.

D&G's case eventually proceeded to trial in April 2018. D&G's theory was that in addition to the written agreement about exchanging assets and existing customers, C&S and SuperValu had an unwritten agreement that C&S would not compete for new customers in the Midwest and that SuperValu would not compete for new customers in the Northeast. Alternatively, as the case developed at trial, D&G claimed that even if C&S did not agree to forego competition for *all* new customers in the Midwest, C&S at least agreed that it would not compete for new business from a subset of potential new customers—namely, independent grocery retailers—in that region. After a two-week trial, a jury returned a verdict for the defendant C&S.

II.

D&G's argument on appeal is that the district court erred in formulating one jury instruction and the verdict form. The district court gave Final Jury Instruction No. 20 as follows:

-3-

Plaintiffs claim that C&S violated Section 1 of the Sherman Act by entering into an Unwritten Agreement with SuperValu to allocate customers and territories along geographic lines. Allocate means to divide.

. . . .

To prevail on this claim against C&S, Plaintiffs must prove each of the following elements by a preponderance of the evidence: (1) C&S and SuperValu were competitors or potential competitors; (2) C&S and SuperValu entered into a conspiracy—specifically, the Unwritten Agreement—in which C&S agreed that it would not compete with Supervalu for new customers in certain territories or geographic areas; and (3) Plaintiffs were injured in their business or property because of the Unwritten Agreement.

R. Doc. 1232, at 21-22.

The district court also asked the jury, on a special verdict form, the following question: "Did the Plaintiffs prove that C&S and SuperValu were competitors or potential competitors, and that they entered into an Unwritten Agreement to divide territories and customers along geographic lines which restricted competition more broadly than the Asset Exchange Agreement?" R. Doc. 1233.

We review the district court's jury instructions, including special verdict forms, for abuse of discretion. *Wilkins v. St. Louis Hous. Auth.*, 314 F.3d 927, 932 (8th Cir. 2002). The pertinent question is "whether the instructions, taken as a whole and viewed in light of the evidence and applicable law, fairly and adequately submitted the issues in the case to the jury." *M.M. Silta, Inc. v. Cleveland Cliffs, Inc.*, 572 F.3d 532, 536 (8th Cir. 2009) (quoting *Bass v. Flying J, Inc.*, 500 F.3d 736, 739 (8th Cir. 2007)). An error requires a new trial if it had a substantial influence on the verdict. *Kotteakos v. United States*, 328 U.S. 750, 765 (1946).

-4-

D&G argues that the district court mistakenly required the plaintiffs to prove that C&S and SuperValu agreed to allocate both customers *and* territories, but that proof of an agreement to divide one or the other should have been sufficient to establish a *per se* violation of the Sherman Act. *See United States v. Topco Assocs., Inc.*, 405 U.S. 596, 608-12 (1972). D&G focuses on the first sentence of the jury instruction, which referred to a claim that the wholesalers agreed "to allocate customers and territories along geographic lines." And D&G highlights the question in the special verdict form asking whether the plaintiffs had proved an agreement "to divide territories and customers along geographic lines."

D&G proposed different instructions and maintains that the district court should have used them instead. D&G asked for instructions on two different claims. The submission on "Claim 1—Allocation of Customers" would have required proof that "C&S agreed with Supervalu to divide up customers along geographic lines." R. Doc. 1138, at 37. The proposed instruction for "Claim 2—Allocation of Territories or Geographical Areas" asked whether the plaintiffs had proved that "C&S agreed that it would not compete with Supervalu in certain territories or geographic areas." R. Doc. 1138, at 39-40.

Whether the jury instructions fairly and adequately submitted the issues to the jury must be considered in light of the evidence and legal theories advanced in a particular case. While it is true that an agreement to allocate either customers or territories could violate the Sherman Act, D&G's theory in this case melded the two. D&G argued that C&S and SuperValu agreed to allocate customers in the Midwest and New England. There was no contention that C&S agreed to divide up customers outside those regions or to allocate those territories without allocating customers in them. It was therefore understandable and consistent with the evidence and arguments for the district court to instruct that D&G must prove that "C&S agreed that it would not compete with Supervalu for new customers in certain territories or geographic areas." Likewise, the reference in the verdict form to "an Unwritten

Agreement to divide territories and customers along geographic lines" is consistent with D&G's primary theory throughout the case—namely, that C&S and SuperValu agreed to allocate new customers in the Midwest to one company and new customers in New England to the other.

D&G complains that the instructions did not allow the jury adequately to consider its alternate theory that the defendants agreed to allocate a certain segment of the new customers in the two regions (*i.e.*, independent grocery retailers) even if they did not divide up all new customers in the two territories. Final Instruction No. 20, however, was sufficient to accommodate the alternate theory. It did not require a finding that the defendants agreed to allocate *all* new customers. The marshaling instruction said that D&G must prove an agreement that C&S "would not compete with Supervalu for new customers in certain territories or geographic areas." If the jury was convinced that C&S agreed that it would not compete with SuperValu for new independent grocer customers in the Midwest, then there was ample room under the instructions to find liability.

We are fortified in this conclusion by the fact that D&G's proposed instructions do not differ meaningfully from the final instruction on this issue. D&G proposed separate instructions asking whether "C&S agreed with Supervalu to divide up customers along geographic lines" or whether "C&S agreed that it would not compete with Supervalu in certain territories or geographic areas." Neither of these instructions parses a distinction between *all* new customers and *a subset* of new customers. D&G's proposed reference to dividing up "customers" along geographical lines is no different from the final instruction's focus on allocating "new customers" in certain territories or geographical areas. If D&G's proposed instruction could accommodate a theory of liability based on dividing up independent grocery retailers along geographical lines, then Final Instruction No. 20 could too.

We are not convinced by D&G's contention that the reference in the verdict form to the defendants dividing "territories and customers along geographic lines" misled the jury. The jury was told in Final Instruction No. 20 that it "must find" liability if "C&S agreed that it would not compete with Supervalu for new customers in certain territories or geographic areas." We consider the instructions as a whole and evaluate the verdict form in light of the instructions. If the jury was persuaded that C&S agreed not to compete for new independent grocer customers in the Midwest, such that it was directed to find for the plaintiffs under the jury instruction, then it is not reasonably likely that any variation between the wording of the instruction and the verdict form caused the jury to believe that it must reject D&G's claim. As Chief Justice Rehnquist once wrote for the Court:

> Jurors do not sit in solitary isolation booths parsing instructions for subtle shades of meaning in the same way that lawyers might. Differences among them in interpretation of instructions may be thrashed out in the deliberative process, with commonsense understanding of the instructions in light of all that has taken place at the trial likely to prevail over technical hairsplitting.

*Boyde v. California*, 494 U.S. 370, 380-81 (1990).

\* \* \*

The judgment of the district court is affirmed.

_____