# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

Nos. 07-1327/1335

_____

In re: SRC Holding Corp., formerly
known as Miller & Schroeder, Inc.,
and its subsidiaries,

              Debtor.

_____

Brian F. Leonard, Trustee,

              Appellee,

    v.

Executive Risk Indemnity, Inc.,

              Appellant.

_____

The Marshall Group; Jerome A.
Tabolich; James E. Iverson; Edward
J. Hentges; Kenneth R. Larsen;
Steven W. Erickson; Paul R.
Ekholm; Mary Jo Brenden; John M.
Clarey; Kenneth W. Dawkins;
Joseph K. Halloran,

           Intervenors below-
           Appellees.

Appeals from the United States
District Court for the
District of Minnesota.


[PUBLISHED]

_____

Submitted: November 15, 2007
Filed: October 27, 2008

_____

Before MURPHY, HANSEN, and GRUENDER, Circuit Judges.

_____

HANSEN, Circuit Judge.

In these appeals, appellant Executive Risk Indemnity, Inc. (ERII) challenges the district court's insurance-coverage determination. Because we conclude that the district court erred in interpreting the parties' insurance policy, we reverse.

## I.

Miller & Schroeder, Inc. (M&S) was a securities underwriter and securities broker that primarily conducted business in Minnesota. In 1997, MI Acquisition Corporation (MI) acquired M&S through a stock purchase, and, in conjunction with that transaction, purchased a three-year insurance policy entitled "Directors and Officers Liability Insurance Policy Including Employment Practices Liability Coverage" (the policy). (J.A. at 234.) M&S is listed as the parent corporation under the policy. In July of 2000, this initial directors and officers (D&O) policy was renewed for another three years without substantive change to its terms. M&S did not purchase a separate errors and omissions (E&O) policy, which generally "protect[s] against liability based on the failure of the insured, in his or her professional status, to comply with what can be considered in simplistic terms to be the standard of care for that profession." Couch on Insurance § 1:35 (3d ed. 2008).

Between December of 1996 and March of 1999, M&S underwrote $140,000,000 worth of Heritage Bonds, and M&S brokers in California sold the bonds in twelve municipal offerings. All of these bonds were eventually defaulted upon. Purchasers of the Heritage Bonds initiated lawsuits and arbitration proceedings against M&S, M&S brokers, and M&S directors and officers. The plaintiffs in these cases allege wide-ranging theories of liability, including violations of federal securities laws, state securities laws, the common law, and the rules and regulations governing members of the National Association of Securities Dealers (NASD). Some of these claims allege that M&S directors and officers were directly involved in illegal securities transactions, while others name M&S directors as defendants solely because they were directors and officers exercising general authority over M&S's involvement in the Heritage Bond transactions.

In 2001, M&S and M&S directors and officers tendered the claims to ERII, but ERII denied coverage, contending that coverage of the claims is precluded by endorsements in the insurance contract. M&S then defended itself against these various claims and incurred $750,000 in legal fees. As a result of the claims, M&S was assessed millions of dollars in damages, and in January of 2002, M&S filed for bankruptcy protection under Chapter 7 of the United States Bankruptcy Code.

Appellee Brian Leonard, the trustee of M&S's bankruptcy estate, initiated this adversary proceeding against ERII in October of 2003 in the United States Bankruptcy Court for the District of Minnesota. The complaint alleged that ERII breached its contract with M&S by failing to defend M&S against, and indemnify M&S for, claims made against it in the Heritage Bond litigation. The complaint also sought both a declaration that the insurance policy provided coverage for these claims as well as damages in the full amount ($5 million) of the policy coverage. Two separate groups of intervenors–primarily made up of former M&S directors and officers seeking the same relief sought by the bankruptcy trustee–had previously commenced actions in the United States District Court for the District of Minnesota seeking defense costs

and coverage under the same policy. Both groups of intervenors were permitted to join the bankruptcy action, and their district court cases were stayed pending resolution of the bankruptcy case.

The trustee, the intervenors, and ERII all filed motions for summary judgment. ERII sought a declaration that it was not obligated to defend M&S against, or provide indemnification for, claims brought in the Heritage Bond litigation. The trustee and intervenors moved for partial summary judgment, seeking a declaration that ERII was obligated to defend M&S against the Heritage Bond claims and provide coverage for at least some of those claims. As to the core issues raised by the trustee, the bankruptcy court denied ERII's motion for summary judgment and granted the trustee's motion for partial summary judgment, concluding that the insurance policy endorsements relied on by ERII did not preclude coverage of some of the Heritage Bond claims, such that ERII was obligated to defend M&S against all of the claims brought in the Heritage Bond litigation. As to the noncore issues raised by the intervenors, the bankruptcy court filed a report and recommendation to the district court that ERII's motion for summary judgment should be denied and that the intervenors' motion for partial summary judgment should be granted for the same reasons the bankruptcy court had ruled in favor of the trustee in the core proceedings. ERII filed objections with the district court as to the bankruptcy court's report and recommendation concerning the intervenors. Meanwhile, the parties entered into a stipulation in which they all agreed how to allocate the $5 million policy limits, which all agreed would be exceeded by the litigation, in the event the bankruptcy court's order and report and recommendation were affirmed. The district court affirmed the bankruptcy court's report and recommendation as to the noncore issues. The bankruptcy court subsequently entered a final judgment as to the core issues based on the parties' stipulation, and ERII appealed that judgment to the United States District Court for the District of Minnesota. The district court affirmed the bankruptcy court's judgment as to the core issues, and it separately entered a final judgment as to the

noncore issues based on the parties' stipulation. ERII timely appealed each judgment, which we have consolidated on appeal.

## II.

The sole issue on appeal is whether the district court erred by concluding that the insurance policy provides defense costs and indemnification for claims brought against M&S and its directors and officers in the Heritage Bond litigation.

With respect to the appeal of the district court's judgment affirming the appeal of the bankruptcy court's judgment on the core proceeding, that is, the adversary complaint filed by the Trustee, we sit as a second court of review, and we apply the same standards of review as the district court. We review the bankruptcy court's findings of fact for clear error and its conclusions of law de novo. Dapec, Inc. v. Small Bus. Admin. (In re MBA Poultry, L.L.C.), 291 F.3d 528, 533 (8th Cir. 2002). With respect to the appeal of the district court's judgment concerning the noncore-related proceedings, that is, the intervenors' actions, we apply the same standards, reviewing fact-findings for clear error and conclusions of law de novo.

We review the district court's affirmance of the bankruptcy court's grant of summary judgment *de novo*. See In re Cochrane, 124 F.3d 978, 981 (8th Cir.), cert. denied, 522 U.S. 1112 (1997). Summary judgment is proper if there are no genuine issues of material fact and the moving party is entitled to summary judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).

The parties agree that our interpretation of the insurance policy is controlled by Minnesota law and that our analysis of the policy is governed by general principles of contract interpretation. See Lobeck v. State Farm Mut. Auto. Ins. Co., 582 N.W.2d 246, 249 (Minn. 1998) ("General principles of contract interpretation apply to

insurance policies.").  When construing insurance policies, Minnesota courts must consider the policy as a whole, giving effect to all of its provisions.  Gen. Mills, Inc. v. Gold Medal Ins. Co., 622 N.W.2d 147, 151 (Minn. Ct. App. 2001).  If the policy language is unambiguous, Minnesota courts give that language its plain and ordinary meaning.  Lobeck, 582 N.W.2d at 249; see Hammer v. Investors Life Ins. Co. of N. Am., 511 N.W.2d 6, 8 (Minn. 1994) ("The court is not free to construe [policy language] in such a way as to afford coverage or to identify an ambiguity where none exists.").  Our duty is to "fastidiously guard against the invitation to create ambiguities where none exist."  Columbia Heights Motors, Inc. v. Allstate Ins. Co., 275 N.W.2d 32, 36 (Minn. 1979) (internal quotations and citation omitted).

Whether policy language is ambiguous is a question of law for the court.  Am. Commerce Ins. Brokers, Inc. v. Minn. Mut. Fire & Cas. Co., 551 N.W.2d 224, 227 (Minn. 1996).  Under Minnesota law, a policy provision is ambiguous if it can reasonably be given more than one meaning on the basis of its language alone.  Id. Extrinsic evidence of the parties' subjective intent cannot be used to create contractual ambiguity where none exists on the face of the policy.  In re Hennepin County 1986 Recycling Bond Litig., 540 N.W.2d 494, 498 (Minn. 1995); see also Minn. Teamsters Pub. & Law Enforcement Employees Union, Local 320 v. County of St. Louis, 726 N.W.2d 843, 847-48 (Minn. Ct. App. 2007) ("Writings other than the contract can not be used to create an ambiguity which does not exist in the contract itself." (internal marks omitted)).  Ambiguity in an insurance policy is generally construed against the insurer.  Thommes v. Milwaukee Ins. Co., 641 N.W.2d 877, 880 (Minn. 2002).

The orders of both the district court and the bankruptcy court state that ERII concedes that the insurance policy provides coverage for the claims brought against M&S and the intervenors, except to the extent the policy endorsements exclude coverage of those claims.  ERII does not dispute coverage on appeal and instead confines its argument to the contention that Endorsement 3 excludes coverage of the Heritage Bond claims.

Endorsement 3 provides:

In consideration of the premium charged, this Policy does not apply to any Claim based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged violation of:

(1)     the Securities Act of 1933, the Securities Exchange Act of 1934, the Investment Company Act of 1940, any other federal law, rule or regulation with respect to the regulation of securities, any rules or regulations of the United States Securities and Exchange Commission, or any amendment of such laws, rules or regulations; or

(2)     any state securities or "Blue Sky" laws or rules or regulations or any amendment of such laws, rules or regulations; or

(3)     any provision of the common law imposing liability in connection with the offer, sale or purchase of securities.

(J.A. at 222.)

The plain language of Endorsement 3 is broad and unqualified. The endorsement not only precludes coverage for claims that allege actual violations of the enumerated federal and state securities laws, it goes further and precludes coverage of "any Claim based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged violation of" those laws. (Id.) Nowhere does this contract language limit its applicability to a specific category of securities transaction, or type of offering or offeror.

Notwithstanding Endorsement 3's unqualified plain language, the bankruptcy court concluded that the provision unambiguously "excludes covered actions taken in connection with the sale of Miller & Schroeder securities but not otherwise." (ERII's

-7-

Add. at 20.) The district court adopted the same, qualified and restricted interpretation of the exclusion. In drawing the same conclusion, the two courts did not discuss the text of Endorsement 3 in any way. Both courts relied, in part, on the deposition testimony of the insurance broker who sold the policy, who testified that this standard-form securities exclusion is typically intended to exclude coverage for liability resulting from the insured's sale of its own stock. Both courts' conclusion that the contract is unambiguous and their reliance on the broker's deposition testimony are legally incompatible; both courts erred by relying on extrinsic evidence of the parties' intent in order to create an ambiguity in Endorsement 3. See Recycling Bond Litig., 540 N.W.2d at 498 (observing that extrinsic evidence may not be considered if the relevant contract language is unambiguous); Murray v. Puls, 690 N.W.2d 337, 343 (Minn. Ct. App. 2004) (noting that extrinsic evidence may be considered if ambiguity exists).

Both courts also reasoned that their limited interpretation of Endorsement 3 is the "only interpretation . . . that makes sense" because most insureds who purchase D&O policies are not engaged in the sale of securities unless they sell their own securities, and, accordingly, Endorsement 3's boiler-plate language typically only precludes coverage for liability resulting from an insured's sale of its own securities. (ERII's Add. at 38-39.) Because the typical effect of Endorsement 3 is to preclude coverage resulting from the insured's sale of its own securities–so the courts' reasoning goes–the meaning of Endorsement 3 in this policy must accord with that typical effect. But the effect of Endorsement 3 as it may be generally applied in practice is not the legal authority that governs our coverage inquiry here; it is the mutually agreed upon policy's plain language that binds M&S and ERII in the first instance.

Both the bankruptcy court and the district court found Endorsement 3 to be unambiguous. But instead of applying the plain unambiguous language of the Endorsement, both courts looked beyond the plain language and used extrinsic (and in our view highly equivocal) evidence concerning one purpose (among several) for

which the exclusion is used in the insurance industry to graft a limitation into Endorsement 3 that it does not contain. In doing so, the courts below ran afoul of established Minnesota law by using extrinsic evidence to construe, rather than directly apply without the aid of extrinsic evidence, language determined to be unambiguous. See Am. Commerce, 551 N.W.2d at 227 ("If no ambiguity exists, there is no reason for construction. . . ."); Berken v. Beneficial Standard Life Insur. Co., 221 N.W.2d 122, 124 (Minn. 1974); Bobich v. Oja, 104 N.W.2d 19, 24 (Minn. 1960) ("Where there is no ambiguity there is no room for construction."); see also Fireman's Ins. Co. of Newark, N.J. v. Viktora, 318 N.W.2d 704, 706 (Minn. 1982) (unambiguous language is "not subject to application of rules of construction which favor finding coverage.")

In the absence of contractual ambiguity, whether policy coverage "makes sense" as a business matter is largely irrelevant; freely contracting actors in the marketplace, particularly sophisticated business entities who rely on experts to advise them, are best suited to determine what makes the most economic sense, and the language they have mutually negotiated and agreed to is the best evidence of what those parties intended. Standing alone, Endorsement 3 cannot be given more than one reasonable meaning on the basis of its plain language. See Piper Jaffray Cos. v. Nat'l Union Fire Ins. Co., 967 F. Supp. 1148, 1155 (D. Minn. 1997) (concluding that a similarly worded mutual-fund exclusion "clearly denies coverage to *any* claim arising out of the ownership or control or management of mutual funds"). Similarly, Endorsement 3 is unambiguous and applies generally to "any Claim based on . . . or in any way involving an actual or alleged violation of" the enumerated securities laws. (J.A. at 222 (emphasis added).) The word "any" when "[r]ead naturally. . . has an expansive meaning." United States v. Gonzales, 520 U.S. 1, 5 (1997). Absent an irreconcilable conflict with an independent portion of the contract, Endorsement 3 is not limited to claims arising out of M&S's sale of its own securities. Such a limitation is nowhere to be found in its language.

M&S and the intervenors contend that Endorsement 3 conflicts with Endorsements 6 and 9, and that the resulting contractual ambiguity must be construed against ERII. See Agency Rent-A-Car, Inc. v. Am. Family Mut. Auto Ins. Co., 519 N.W.2d 483, 487 (Minn. Ct. App. 1994) ("An insurance contract is ambiguous . . . if there exists an irreconcilable conflict between its terms or provisions."). The text of Endorsement 6 states that "Endorsement No. 3 will not apply to any Claim made against an Insured Person arising out of the offering, sale or purchase of Common Stock as described more fully in the Private Placement dated as of May 20, 1997." (J.A. at 225.) The language of Endorsement 6 limits the broad exclusion accomplished by Endorsement 3, ensuring that Endorsement 3 does not exclude coverage for liability arising out of the specified May 20, 1997, securities placement. Endorsement 6's limitation on the scope of Endorsement 3 does not produce a conflict between the two policy exclusions, and Endorsement 6 in no way compels the limited reading of Endorsement 3 adopted by the courts below. Endorsement 6's import is the same regardless of whether Endorsement 3 excludes coverage for any securities-law violation in accordance with its plain language or if it is construed, as the courts below did, to be limited to coverage for liability arising out of M&S's sale of its own securities. Either way, Endorsement 6 ensures that Endorsement 3 does not exclude coverage for liability arising out of the specified 1997 securities placement. Simply stated, Endorsement 6 states a specific exception to the broad exclusion contained in Endorsement 3.

Whether Endorsement 3 and Endorsement 9 are reconcilable on the basis of the policy's plain language is a more difficult question. Endorsement 9–the "General E & O Exclusion (with Management Carveback)"–provides:

In consideration of the premium charged:

(1)    No coverage will be available under the Policy for Loss including Defense Expenses for any Claim made against any Insured based on, arising out of, directly or indirectly resulting from, in

-10-

consequence of, or in any way involving an Insured's actual or alleged rendering or failure to render the following services:

Investment Banking Services
Security Broker/Dealer Services
Securities Underwriting

(2)     Paragraph (1) above is not intended, however, nor shall it be construed, to apply to Loss, including Defense Expenses, in connection with any Claim against an Insured to the extent that such Claim is for a Wrongful Act by Insured Person in connection with the management or supervision of any division, Subsidiary or group of the Parent Corporation offering any of the aforementioned services.

(Id. at 229.)

M&S and the intervenors urge this court to reject the unqualified, plain-language reading of Endorsement 3 because, according to the appellees, that reading renders the exclusion effected by Endorsement 9 superfluous. See Chergosky v. Crosstown Bell, Inc., 463 N.W.2d 522, 526 (Minn. 1990) ("Because of the presumption that the parties intended the language used to have effect, we will attempt to avoid an interpretation of the contract that would render a provision meaningless."). The appellees also assert that under the broad, plain-language reading of Endorsement 3, section (2) of Endorsement 9–the "Management Carveback"–is without effect.

We respectfully disagree with the appellees' position. Because Endorsement 9 precludes claims not precluded by Endorsement 3, Endorsement 9 is not superfluous. Paragraph (1) of Endorsement 9 excludes coverage for any claim that in any way involves the insureds' rendering of or failure to render investment-banking services, security-broker/dealer services, or securities-underwriting services, insofar as that exclusion is not negated or qualified by the Management Carveback. Endorsement 9(1)'s scope is broader than Endorsement 3 because Endorsement 9(1)

-11-

excludes claims unrelated to the specific named securities laws enumerated by Endorsement 3. For example, certain antitrust suits related to the rendering of securities or investment-banking services but not involving securities law violations would be excluded by Endorsement 9(1) but not by Endorsement 3. On account of the Management Carveback, Endorsement 3 also reaches and excludes claims not excluded by Endorsement 9. The Management Carveback (paragraph (2)) provides that Endorsement 9 does not apply to claims that relate to the management of an M&S division, subsidiary, or group offering the three services listed in paragraph (1). But Endorsement 3's broad exclusion reaches and precludes coverage for such mismanagement claims insofar as they are "based on . . . or in any way involve[]" actual or alleged violations of the listed securities laws. (J.A. at 222.)

Contrary to the appellees' position, our reading of the contract does not render the Management Carveback meaningless. The appellees' critical assumption in asserting that the Management Carveback is inoperative under a broad reading of Endorsement 3 is that all claims saved by the Management Carveback–claims for an insured's wrongful acts "in connection with the management or supervision of any division, Subsidiary or group of [M&S] offering" investment-banking, security-broker/dealer, or securities-underwriting services–are cognizable under the securities laws enumerated in Endorsement 3 and are therefore excluded under that provision. (J.A. at 229.) We agree that if coverage for all of the claims saved by the Management Carveback is precluded by Endorsement 3, then this Carveback may be sufficient to create contractual ambiguity difficult to reconcile on the basis of the policy language alone. But in our view, the appellees' assumption is erroneous, and Endorsement 9's Management Carveback is not superfluous. Several types of claims that do not allege or relate to violations of the federal and state securities laws listed in Endorsement 3 are saved by the Management Carveback. For example, shareholder derivative suits alleging director management misconduct in supervising investment-banking services would not be excluded by Endorsement 3 because they do not state a claim under the enumerated securities laws (or necessarily relate to such claims), yet

these derivative suits would be excluded by Endorsement 9 if not for the Management Carveback. Similarly, claims for tortious interference with contract that would not implicate the securities laws in Endorsement 3, could be excluded under Endorsement 9(1), but would be saved by the Carveback in Endorsement 9(2). Accordingly, we must reject the appellees' contention that Endorsement 3 renders the Management Carveback inoperative.

We do agree with the appellees that when Endorsement 3 is given its plain meaning, the exclusions accomplished by both endorsements (3 and 9) are to some degree redundant. We also agree that Endorsement 3 limits the coverage for security-broker/dealer claims and securities-underwriting claims related to the violation of securities laws that the Management Carveback purports to bring back within the realm of coverage. But as our foregoing discussion demonstrates, our interpretation of the parties' insurance policy does not render any of its provisions meaningless. And any overlapping in the coverage excluded by Endorsements 3 and 9 is not sufficient to disregard the broad and unqualified language of Endorsement 3. Nothing prevents the parties from using a "belt and suspenders" approach in drafting the exclusions, in order to be "doubly sure."

We also must respectfully differ with both courts' conclusion below that our interpretation of the policy would render coverage illusory under the policy, in contravention of Minnesota's illusory-coverage doctrine. The doctrine of illusory coverage qualifies the general rule that insurance contracts will be enforced in accordance with their plain language. Jostens, Inc. v. Northfield Ins. Co., 527 N.W.2d 116, 118 (Minn. Ct. App. 1995). Under the doctrine, "liability insurance contracts should, if possible, be construed so as not to be a delusion to the insured." Id. (internal marks omitted). The doctrine is "best applied . . . where part of the premium is specifically allocated to a particular type or period of coverage and that coverage turns out to be functionally nonexistent." Id. at 119; see also United Fire & Cas. Co. v. Fid. Title Ins. Co., 258 F.3d 714, 719 (8th Cir. 2001) (quoting Jostens for the

-13-

proposition that the illusory-coverage doctrine applies "*only* when 'part of the premium is specifically allocated to a particular type or period of coverage'" (emphasis added)). Here, the appellees make no claim that any part of M&S's insurance premium was allocated for particular categories of coverage. Moreover, coverage under the policy is not a delusion; the policy provides coverage for claims in connection with the 1997 M&S securities placement described in Endorsement 6, claims alleging unlawful employment practices, including failure to hire or promote, termination, sexual harassment, race, age, and retaliation claims (no small exposure in today's legal climate), and shareholder derivative suits not precluded as described above, among potential others. See United Fire, 258 F.3d at 719 (concluding that the doctrine was inapplicable where the insurance policy provided coverage under many circumstances); see also BancInsure, Inc. v. Marshall Bank, N.A., 453 F.3d 1073, 1076 (8th Cir. 2006) (same). The illusory-coverage doctrine just does not apply here.

We also conclude that insofar as the courts below relied on the doctrine of reasonable expectations, this reliance was error. That doctrine is inapplicable here because the contract language is unambiguous, see Hubred v. Control Data Corp., 442 N.W.2d 308, 311 (Minn. 1989) (noting that contractual ambiguity, or the lack thereof, is one factor Minnesota courts consider when determining whether the doctrine of reasonable expectations is applicable); Endorsement 3 is not hidden, but clearly set forth in the exclusion section of the policy, see Bd. of Regents v. Royal Ins. Co. of Am., 517 N.W.2d 888, 891 (Minn. 1994) (concluding that the doctrine was inapplicable where the applicable policy exclusion was "plainly designated as such"); and the contracting parties are sophisticated business organizations that negotiated portions of the policy, see St. Paul Fire & Marine Ins. Co. v. Fed. Deposit Ins. Corp., 968 F.2d 695, 703 (8th Cir. 1992) (observing that Minnesota courts have consistently limited the applicability of the doctrine to cases in which a hidden policy exclusion is the product of unequal bargaining power).

For the foregoing reasons, we conclude that the bankruptcy and district courts both erred by interpreting Endorsement 3's scope as limited only to claims arising out of M&S's sale of its own securities. That reading of the insurance contract finds no support in the language of Endorsement 3, and Endorsement 9 does not conflict with Endorsement 3 in a way irreconcilable by applying the plain language of those two policy exclusions.

## III.

Appellees contend that even if we reject the courts' limited reading of Endorsement 3, coverage for the appellees' violation of NASD rules is not precluded by Endorsement 3, and because NASD liability is covered under the policy, ERII is obligated to defend appellees in the related non-NASD proceedings. The language of the insurance policy, however, forecloses the appellees' argument.

Instead of limiting the exclusionary scope of Endorsement 3 to particular theories of legal recovery, the plain language of the Endorsement extends its reach more broadly to exclude "any Claim based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving" any actual or alleged violation of the enumerated state and federal securities laws. (J.A. at 222.) It must be remembered that what the policy insures against is liability for wrongful acts - not violations. (See Insuring Agreements, id. at 234 ("the Underwriter will pay . . . from Claims . . . for Wrongful Acts. . . .").) A "Wrongful Act" is defined as:

> (2) any . . . actual or alleged act, error, omission, misstatement, misleading statement or breach of duty by an Insured Person in his or her capacity as a director or officer of the Company; [and]

-15-

> (3) any matter asserted against an Insured Person solely by reason of his or her status as a director or officer of the Company.

(Id. at 236.) A "Claim" under the policy is defined as "written notice received by an Insured that any person or entity intends to hold any Insured responsible for a Wrongful Act." (Id. at 235.) Endorsement 3's broad language and the policy's definition of Claim indicate that the fact that the claims allege violations of laws or rules not listed in Endorsement 3 is not dispositive. The exclusionary scope of Endorsement 3 is tied to the insured's allegedly wrongful conduct and the operative facts underlying that conduct, not just the legal authority on which each claim is grounded. The policy's language governing the "Timing and Interrelationship of Claims" makes this even more apparent. (Id. at 242.) That provision states that "[all] Related Claims will be treated as a single Claim made when the earliest of such Related Claims was first made . . . ." (Id. at 243.) "Related Claims" are defined as "all Claims for Wrongful Acts based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving the same or related facts, circumstances, situations, transactions or events or the same or related series of facts, circumstances, situations, transactions or events." (Id. at 236.) This plain policy language makes clear that if the same set of operative facts underlies both the federal- and state-law securities violations and the alleged violations of unenumerated legal authority, such as the NASD rules, the broad, plain language of Endorsement 3 excludes coverage for all of those violations.

Here, the plaintiffs in the underlying litigation, whether alleging violations of federal law, state law, or NASD rules, all allege that M&S and its directors and officers engaged in misconduct and wrongful acts in conjunction with the underwriting and sale of the Heritage bonds. The appellees make no showing that any of the alleged NASD violations are based on a factual basis independent of the violations of federal and state law precluded by Endorsement 3. In fact, counsel for the intervenors conceded at oral argument that all of the allegedly illegal acts,

including the alleged NASD violations, arise out of the same common set of facts. Because the NASD claims arise out of the same operative set of facts as the claims explicitly excluded by Endorsement 3, they are related claims that "will be treated as a single claim" (id. at 243), and accordingly we conclude that coverage for the NASD claims is likewise precluded by the policy.

In Upsher-Smith Labs., Inc. v. Fed. Ins. Co., 264 F. Supp. 2d 843, 850 (D. Minn. 2002), aff'd per curiam, 67 Fed. Appx. 382, (8th Cir. 2003) (unpublished), the district court held that a similarly worded antitrust exclusion in a D&O policy excluded coverage for not only a complaint brought by the Federal Trade Commission alleging facts demonstrating two specific violations of the Federal Trade Commission Act, a statute listed in the exclusion, but also excluded coverage for more than 40 private civil actions which alleged the same set of operative facts as the FTC complaint, but which raised common law and non-antitrust statutory claims and sought non-antitrust relief in the form of common law restitution, unjust enrichment, and disgorgement, including injunctive relief. Relying on Minnesota and Eighth Circuit cases demonstrating that the term "arising out of" as used in a variety of insurance policy contexts was unambiguous and broad, the court said it also meant "flowing from" or "having their origins in." Id. at 85l (internal marks omitted).

We apply the same analysis here. Upsher-Smith's analysis and focus on underlying facts is reinforced in this case by the policy's definition of "Related Claims." As we have explained above, each of the allegations of conduct alleged to be violative of the NASD rules arise out of, flow from, and have their origins in the same set of operative facts as those allegations alleging a violation of the securities laws listed in Endorsement 3. The Trustee's and the Intervenors' attempts to distinguish Upsher-Smith are not persuasive. Because each of the allegations of NASD rule violations relies on the same set of facts and alleged wrongful acts which underlie the securities law violation allegations, the NASD allegations stand on and share the same factual foundation and are, in our view, well within the "arising out of"

exclusionary language of Endorsement 3 and the expansive Related Claims provisions of the policy.

Boiled down, the Trustee's and the Intervenors' attempts to turn this D&O policy into one providing E&O coverage fail. We reverse the judgments of the district court and remand for the entry of summary judgment in favor of ERII.

_____