[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 14-12557
_____

D.C. Docket No. 7:14-cv-00384-WMA,
Bkcy No. 7:11-bk-70573-CMS

In re: RODNEY HALEY,

                                                          Debtor.

_____

PORTER CAPITAL CORPORATION,

                                                          Plaintiff - Appellant,

versus

RODNEY HALEY,

                                                           Defendant,

SOBCON CONCRETE COMPANY INC,

                                                          Defendant - Appellee.

_____

Appeal from the United States District Court
for the Northern District of Alabama
_____

(April 6, 2015)

Before MARCUS, ROSENBAUM and GINSBURG,[*] Circuit Judges.

PER CURIAM:

Porter Capital Corporation appeals from the District Court's order entering judgment in favor of Sobcon Concrete Company, Inc., on Porter's claims against Sobcon in a non-core bankruptcy adversary proceeding. Porter Capital asserts that it is entitled to payment from Sobcon for various construction materials that were delivered to Sobcon by third party Custom Steel and Supply, with whom Porter Capital had a factoring agreement. In addition, Porter Capital maintains that it is entitled to double payment from Sobcon for payments Sobcon made directly to Custom Steel.

In the proceedings at the trial level, the Bankruptcy Court held a trial and submitted proposed findings of fact and conclusions of law to the District Court, recommending that judgment be entered against Porter Capital. The District Court adopted those findings and conclusions without modification. Finding no error in the Bankruptcy Court's findings and the District Court's review of those findings, we now affirm.

---

[*] Honorable Douglas H. Ginsburg, United States Circuit Judge for the District of Columbia, sitting by designation.

**I.**

**A.  Factual Background**

Rodney Haley owned and managed Custom Steel and Supply, an Alabama company that supplied steel rebar and concrete reinforcement products.  In order to finance his company, Haley entered into a factoring agreement with Plaintiff-Appellant Porter Capital Corporation on July 31, 2003.  Under this agreement, Haley submitted the invoices of Custom's customers to Porter Capital in exchange for Porter Capital's advancement to Custom of 80% of the cash value of the invoices.  Custom's customers then remitted payment directly to Porter Capital, which reimbursed itself the 80% advance as well as its fee, and set the remaining balance aside in a reserve account for Custom.  The agreement also required Custom to forward to Porter Capital any payments it received from its customers that should have been sent to Porter Capital.

Sobcon Concrete Company, Inc., was a customer of Custom.  Relevant to this lawsuit are nineteen disputed Custom invoices for products allegedly sent to Sobcon that Haley had submitted to Porter Capital.  It is undisputed that Porter paid the 80% advance on those nineteen invoices and then sought payment from Sobcon.

After first denying that any of those invoices were legitimate, Sobcon eventually admitted that five of the nineteen invoices were legitimate but

3

contended that it never received the products listed on the remaining fourteen invoices. The central factual dispute in this case focuses on whether those fourteen invoices represent legitimate deliveries to Sobcon that Sobcon actually received.

## B.  Procedural History

Haley filed a voluntary bankruptcy petition under Chapter 7 on March 18, 2011, in the Northern District of Alabama. Porter Capital initiated an adversary proceeding in the Bankruptcy Court on May 18, 2011, contesting the dischargeability of Haley's debt on the ground that the Custom invoices to Sobcon were fraudulent. In particular, Porter Capital contended that Custom never provided Sobcon with the materials for which it invoiced Sobcon. Although Porter Capital added Sobcon as a defendant in its First Amended Complaint, Porter Capital did not levy a claim specifically against Sobcon until it filed its Fourth Amended Complaint (the operative complaint).

The Fourth Amended Complaint set forth two causes of action: Count One asserted that Haley's debt was not dischargeable under 11 U.S.C. § 523(a)(2)(A) and (B) because Haley fabricated the invoices to defraud Porter Capital. Count Two alleged that Sobcon received the invoiced products and was liable on the invoices to Porter Capital. Count Two also claimed that under Section 9-406 of the

4

Uniform Commercial Code ("UCC"),[1] Sobcon was liable for double payment because it was aware that Custom had assigned its payment rights to Porter Capital. In its Fourth Amended Complaint, Porter Capital conceded that Count One was a core proceeding under 28 U.S.C. § 157(b)(2)(I) but asserted that its action against Sobcon in Count Two was a non-core proceeding under 28 U.S.C. § 157(c). Both claims were tried together by the Bankruptcy Court.

After a two-day trial in March 2013, the Bankruptcy Court issued findings of fact and conclusions of law, entering final judgment against Porter Capital on each of its claims. More specifically, the Bankruptcy Court determined that Porter Capital had failed to prove either that it was more likely than not that the invoices were fraudulent or that the products were ever delivered to Sobcon. *Porter Capital Corp. v. Haley* (*In re Haley*), Adversary No. 11-70016, 2013 WL 5592890, at *7, *9 (Bankr. N.D. Ala. Oct. 9, 2013). In addition, the Bankruptcy Court found that Sobcon had never received proper notice of the factoring agreement under Alabama Code § 7-9A-406, so Sobcon was not liable for double payment on any invoices that it had paid directly to Custom. *Id.* at *11.

Although the Bankruptcy Court originally entered final judgment on both counts, Porter Capital filed a motion to amend the judgment, pointing out that in

---

[1] Although the Fourth Amended Complaint does not reference an enacted statutory provision, the parties agree that the relevant statute is Alabama's version of the UCC, specifically Alabama Code § 7-9A-406.

non-core proceedings under § 157(c), the Bankruptcy Court may only submit proposed findings of fact and conclusions of law to the District Court, which then must conduct a *de novo* review of any objections made by a party.

The Bankruptcy Court granted Porter Capital's motion. In amending its previous order, the Bankruptcy Court declared that "the portions of the Memorandum Opinion that resolve Count Two of the Fourth Amended Complaint must be submitted to the United States District Court for the Northern District of Alabama for de novo review." *Porter Capital Corp. v. Haley* (*In re Haley*), Adversary No. 11-70016, 2014 WL 585296, at *2 (Bankr. N.D. Ala. Feb. 14, 2014).

Porter Capital timely filed with the District Court objections to the Bankruptcy Court's resolution of its claims against Sobcon. The objections boiled down to Porter Capital's contention that its evidence was more credible and was entitled to more weight than the Bankruptcy Court assigned it. Porter Capital did not appeal to the District Court the Bankruptcy Court's resolution of the core proceeding against Haley.

On May 8, 2014, the District Court issued a memorandum opinion overruling Porter Capital's objections and adopting the Bankruptcy Court's order. *Porter Capital Corp. v. Sobcon Concrete Co., Inc.*, No. 7:14-cv-0384-WMA, 2014 WL 1873297 (N.D. Ala. May 8, 2014). The District Court noted first that Porter

Capital had not appealed the Bankruptcy Court's decision on the core dischargeability claim. *Id.* at *2. Emphasizing the intertwined nature of the core and non-core claims, the District Court invoked the doctrine of *res judicata* to find that the Bankruptcy Court's resolution of certain legal and factual issues against Porter Capital on the core claim precluded Porter Capital from rearguing those legal and factual issues or prevailing on its non-core claim. *See id.* at *3-4.

After engaging in this *res judicata* analysis, the District Court held in the alternative that, "upon a mandatory *de novo* consideration of the entire record, including the objections filed by Porter," it reached the same conclusions as the Bankruptcy Court. *Id.* at *4-5. In setting forth the basis for this ruling, the District Court quoted and highlighted various portions of the Bankruptcy Court's memorandum and then adopted the Bankruptcy Court's proposed findings and conclusions as its own. *Id.*

## II.

In reviewing a bankruptcy case, "this Court sits as a second court of review and thus examines independently the factual and legal determinations of the bankruptcy court." *Brown v. Gore* (*In re Brown*), 742 F.3d 1309, 1315 (11th Cir. 2014) (citation and internal quotation marks omitted). We review a district court's entry of judgment in a non-core proceeding under 28 U.S.C. § 157(c)(1) following a bench trial in the bankruptcy court in the same manner that we would review any

bench trial, considering findings of fact for clear error and conclusions of law *de novo*. *See id.*; *see also Leonard v. Exec. Risk Indem., Inc.* (*In re SRC Holding Corp.*), 545 F.3d 661, 666 (8th Cir. 2008).

## III.

## A.

On appeal, Porter Capital argues that the District Court's *res judicata* analysis was faulty, that the District Court failed to conduct the *de novo* review of the non-core proceeding required by statute, and that, to the extent that it did conduct a *de novo* review, that review was flawed. In Porter Capital's view, the District Court erred in its review because it allegedly applied the wrong burden of proof, incorrectly weighed the evidence of delivery, and drew mistaken conclusions about when Sobcon received notice of the factoring agreement.

In this section, we discuss why Porter's claim that the District Court failed to conduct a *de novo* review is without merit. In the following section, we explain why the Bankruptcy Court's recommendation and the District Court's review of that recommendation were not erroneous. Because we conclude that the District Court conducted the required *de novo* review and because we find no error in that court's review, we affirm the judgment of the District Court. Therefore, we need not opine on whether the District Court appropriately alternatively invoked and properly applied the doctrine of *res judicata* in this case.

8

**B.**

In non-core bankruptcy proceedings, district courts are required to give consideration to a bankruptcy judge's proposed findings of fact and conclusions of law and also to "review[] de novo those matters to which any party has timely and specifically objected."  28 U.S.C. § 157(c)(1).  Federal Rule of Bankruptcy Procedure 9033 requires the district court to make its review "upon the record" and permits the district court to take additional evidence.  Fed. R. Bankr. P. 9033(d). After review, the district court "may accept, reject, or modify the proposed findings of fact or conclusions of law, receive further evidence, or recommit the matter to the bankruptcy judge with instructions." *Id.*

In this case, the District Court stated that it, "upon a mandatory *de novo* consideration of the entire record, including the objections filed by Porter, reache[d] the same conclusion the Bankruptcy Court purportedly reached in the adversary proceeding, and then downgraded into a report and recommendation." *Porter Capital*, 2014 WL 1873297, at *4.  The District Court then block quoted with emphasis four passages from the Bankruptcy Court's memorandum:  (1) the factual finding that Porter Capital did not verify the legitimacy of invoices before advancing cash to Custom, *id.*; (2) the conclusion that failing to prove fraud, in and of itself, does not necessarily prove delivery, *id.* at *5; (3) the conclusion that the evidence established two equally plausible theories—(a) fraud on the part of

9

Custom and Haley and (b) Custom's legitimate invoicing of Sobcon and Sobcon's actual receipt of all items invoiced to it by Custom—and, since one was not shown to be more likely than the other, that Porter had failed to carry its burden to establish delivery and Sobcon's liability, *id.*; and (4) the conclusion that Sobcon did not receive adequate notice of the factoring agreement prior to remitting payment on three invoices directly to Custom, so it was not liable for double payment, *id.*  The District Court concluded its order by overruling Porter's objections and adopting the Bankruptcy Court's opinion as its own.  *Id.*

Porter Capital maintains that, despite this language, the District Court failed to conduct a *de novo* review of Porter Capital's objections.  In support of its contention, Porter Capital points to alleged inconsistencies in the District Court's *res judicata* discussion as evidence that the District Court misunderstood Porter Capital's claim.  But, in our view, any disagreements that Porter Capital may have with statements that the District Court made in its *res judicata* analysis do not rise to a level sufficient to undermine the conclusion that the District Court did indeed conduct a *de novo* review of the Bankruptcy Court proceedings.

Porter Capital also complains that the District Court only quoted from the Bankruptcy Court's memorandum and did not cite any record evidence as illustrating that the District Court did not review and weigh the evidence anew.

But the quoting of the Bankruptcy Court's opinion fails to demonstrate the absence of a *de novo* review.

First, Rule 9033 permits a district court to "accept, reject, or modify" the Bankruptcy Court's proposed findings, suggesting that a district court may permissibly accept those findings unmodified after a proper review. *See* Fed. R. Bankr. P. 9033(d). Second, the District Court's order gives no indication that the court applied the wrong standard of review to the Bankruptcy Court's factual or legal determinations in these quoted passages. *See Porter Capital*, 2014 WL 1873297, at *4-5; *cf. Cont'l Nat'l Bank of Miami v. Sanchez* (*In re Toledo*), 170 F.3d 1340, 1350 & n.12 (11th Cir. 1999) (noting the impropriety of a district court's employment of a clear-error or deferential review to a non-core proceeding under § 157(c)). To the contrary, the District Court expressly said that it reached the "same conclusion" after "*de novo* consideration of the entire record."

Third, nothing in the record suggests that the District Court did not, in fact, conduct a *de novo* review when it specifically said that it did. Accordingly, we discern no basis from which we can conclude that the District Court, despite its express statements, did not conduct a *de novo* review of the record as required by § 157(c)(1).

## IV.

Having established that the District Court conducted the required *de novo* review, we now turn to Porter Capital's complaints about the substance of that review. As noted above, Porter Capital argues on appeal that the District Court's review was flawed because the court impermissibly held Porter Capital to a higher burden of proof on its delivery claim, incorrectly weighed the evidence when it held that Porter Capital had not proven delivery, and erroneously denied Porter Capital's double-payment claim by drawing the wrong conclusions about when Sobcon received notice of the factoring agreement. We address each argument in turn. But first, we provide a recap of the relevant evidence and related conclusions reached in the Bankruptcy Court.

## A.

Shortly after Haley received payment from Porter Capital on the nineteen disputed invoices, at around the time that Custom was going out of business in September 2010, Haley had a conversation with Sobcon's owner, John Scarbrough. Scarbrough testified in a deposition and at trial that Haley told him during this conversation "not to worry about" any invoices that would come after Custom closed its doors. Scarbrough interpreted this conversation to mean that Sobcon did not owe any money on any outstanding invoices. For his part, Haley testified that

12

he was merely telling Scarbrough that if Sobcon disputed any of the invoices, Custom's reserve account with Porter Capital would cover any unpaid balance.

On January 20, 2011, Porter Capital's attorney sent a letter to Sobcon requesting $69,198.61 in payment of the nineteen invoices and attorney fees. On February 2, 2011, Sobcon's attorney responded, stating that after a "thorough accounting," Sobcon determined that it did not owe any money on the invoices and suggesting that Custom had fabricated the invoices. Scarbrough later swore out an affidavit in May 2011 averring that the invoices were fraudulent. Nevertheless, a subsequent review of Sobcon's paper files determined that at least five of the nineteen invoices were legitimate; three of those invoices had been paid directly by Sobcon to Custom in September 2010, and Sobcon admitted that it owed payment on two more invoices. Sobcon's initial averments were apparently based solely on a computer search of Sobcon's records, despite the fact that Sobcon apparently did not consistently log invoice numbers into its computer system.

All of the disputed invoices were introduced at trial. Eighteen[2] of the nineteen disputed invoices also had corresponding "delivery tickets." The testimony at trial established that Custom did not take purchase orders but rather took orders over the phone and recorded them on three-part delivery tickets. One part was used to generate the invoice and a "Schedule of Accounts" that Custom

---

[2] The invoice without a corresponding delivery ticket was one that Sobcon paid in September 2010, so no dispute exists with respect to delivery on that invoice.

would send to Porter Capital.  The other two parts of the ticket would go to the shop where the order was assembled.  At least one of the parts would be taken by the delivery driver.  Custom did not require anyone to sign for its deliveries and, in fact, did not require anyone to be present to accept its deliveries.  If someone was present, the delivery driver would leave the ticket with that person, but it was not established what the driver would do with tickets when no one was present.  None of the delivery tickets included any information about who placed or received the order or who delivered or received the goods.

Sobcon had a similarly lax record-keeping system.  It did not use purchase orders and permitted project foremen to place orders.  Sometimes these orders would be noted on "daily job sheets," but no daily job sheets were submitted as evidence at trial.  A Sobcon employee testified that she reviewed the daily job sheets, but she could not identify any sheets with orders that corresponded to the disputed invoices.  Sobcon did not require anyone to be present to sign for deliveries, but when someone was present and did receive a delivery ticket, the ticket would be placed in the project's job folder.

As for Porter Capital, one of its employees testified that its preferred practice was to verify delivery on an invoice before it advanced cash.  But, the Bankruptcy Court found this testimony was not credible.  The Bankruptcy Court reasoned that if it were, Porter Capital necessarily would have caught any fraudulent invoices

14

before making payment.   Moreover, the Bankruptcy Court noted, a Sobcon employee testified that she could recall only a single instance where Porter attempted to verify delivery, and it did so then only because the invoice was unusually large.

Turning to the claims against Haley, the Bankruptcy Court found no evidence that indicated that the invoices were fraudulent.   Each invoice had a delivery ticket, so there was no discrepancy among those records.   Similarly, the Bankruptcy Court determined that the absence of any signatures on the tickets failed to support an inference of fraud because neither Custom nor Sobcon had a consistent practice of obtaining signatures.   The lack of regular record keeping also prevented the Bankruptcy Court from finding fraud.   For example, in the Bankruptcy Court's view, the fact that Sobcon turned up five legitimate invoices even after Scarbrough had sworn that it had conducted a thorough inventory and found none were legitimate highlighted the uselessness of the companies' records as evidence of fraud.

With unreliable records, the court was left with conflicting testimony from Haley and Sobcon.   Haley testified that the invoices were legitimate.   Dena Rogers, a current bookkeeper of Sobcon and former employee of Custom testified that Sobcon never received the invoiced materials.   Rogers also testified that when she worked for Haley thirteen years earlier, Haley allegedly engaged in dishonest

15

activity by submitting invoices to a bank to receive cash advances and then never mailing those invoices to customers, although Rogers could not say whether those invoices were fraudulent.   The Bankruptcy Court found Rogers's testimony credible overall, but it placed little weight on the testimony about Haley's allegedly dishonest activities because they happened over thirteen years before and did not relate to the specific invoices at issue in this case.   Ultimately, the Bankruptcy Court concluded that Porter Capital had failed to prove that Haley had committed fraud.

Similarly, the Bankruptcy Court determined that Porter Capital had failed to prove that the deliveries to Sobcon had ever been made.   In reaching this conclusion, the court noted that Porter Capital's failure to prove fraud did not conversely necessarily prove that the deliveries had been made.   Although the court found that the delivery tickets were the "best evidence" Porter Capital had of delivery, the court explained the shortcomings of that evidence that resulted in its decision to give the evidence little, if any, weight:   the companies' lax record-keeping schemes, including a lack of purchase orders that matched the tickets; a lack of any requirement that anyone be present to receive or sign for a delivery; and the lack of any safeguards against fraud.   According to the Bankruptcy Court, "[t]here just is no way to verify whether the materials invoiced on the Disputed Invoices were actually delivered by looking at the delivery tickets admitted into

16

evidence." The court added, "the delivery tickets admitted into evidence are not conclusive evidence of delivery."

The Bankruptcy Court found the testimony similarly unenlightening because it determined that neither side was "obviously lying." It ruled that the invoices from other jobs submitted by Haley were irrelevant to the disputed invoices. And it determined the testimony of Sobcon's witnesses to be of mixed reliability because Sobcon did not introduce into evidence the project folders on which its employee based her testimony and because Sobcon's previous accountings of its records had been inconsistent. In the end, the Bankruptcy Court determined that two equally plausible scenarios remained: Haley was lying or Sobcon was lying. Because the court found neither was more likely than the other, it concluded that Porter Capital had failed to carry its burden of proving delivery.

Finally, with respect to the payments made by Sobcon on three of the invoices directly to Custom in September 2010, the Bankruptcy Court determined that Porter Capital had failed to prove sufficient notice under Alabama's UCC. Specifically, the court did not credit Porter Capital's employee's testimony that Porter sent a notice of assignment with every invoice because Porter Capital entered no supporting documentation into evidence, and Sobcon's employee testified that no such notice had ever been received.

17

The court also found that any conversation between Haley and Scarbrough in September 2010 provided insufficient notice because it did not apprise Scarbrough of the legal implications of the factoring agreement. And finally, the court determined that the fact that the invoices required remittance to "Custom Steel, c/o Porter Capital" at Porter Capital's address did not provide notice that rights under the invoice had been assigned to Porter Capital. Because the court previously ruled that Sobcon first received written notice of the factoring agreement on October 15, 2010—after the September 2010 payments had been made to Custom—Sobcon was not liable for double payment to Porter Capital.

**B.**

Porter Capital contends on appeal that the Bankruptcy Court and, by adoption, the District Court held it to an impermissibly high burden of proof on its delivery claim. Specifically, Porter Capital points to the Bankruptcy Court's discussion of the delivery tickets, where the court concluded that "the delivery tickets admitted into evidence are not *conclusive evidence* of delivery," *In re Haley*, 2013 WL 5592890, at *8 (emphasis added), as demonstrating that the court required Porter Capital to prove delivery by more than a preponderance of the evidence. But, Porter's argument conflates the assigning of weight to a specific piece of evidence with the overall evidentiary burden, and the record does not

18

support Porter Capital's assertion that the Bankruptcy Court or the District Court imposed a higher burden of proof than proof by a preponderance of the evidence.

First, in context, the reference to "conclusive evidence" clearly refers to the character of only the delivery-ticket evidence and conveys simply that, in light of the unsigned and loosely regulated nature of the tickets, the tickets could not, by themselves, establish that delivery had occurred. Such a statement goes to the weight of the delivery-ticket evidence, not the ultimate burden assigned to Porter Capital on the delivery issue. *Cf. Childrey v. Bennett*, 997 F.2d 830, 834 (11th Cir. 1993) (noting that it is the "exclusive province of the judge in non-jury trials to assess the credibility of witnesses and to assign weight to their testimony").

Second, the Bankruptcy Court expressly applied the proper standard. It found that the evidence supported two equally plausible scenarios, neither more likely than the other. *In re Haley*, 2013 WL 5592890, at *9. Because it determined that the weight of the evidence overall did not tip the scales even slightly in Porter Capital's favor, the court applied the correct burden of proof in this case. *See Blossom v. CSX Transp., Inc.*, 13 F.3d 1477, 1480-81 (11th Cir. 1994) (describing the preponderance-of-evidence standard). While Porter Capital may disagree with the court's ultimate weighing of the evidence, it is clear that the court did not require Porter Capital to prove by any more than a preponderance of the evidence that the materials were delivered to Sobcon.

19

## C.

Next, Porter Capital contends that, even if the Bankruptcy Court and District Court applied the correct burden, the Bankruptcy Court (and the District Court) erred in the factual findings and legal conclusions that led it to conclude that Porter had not demonstrated delivery.  As noted, we review legal conclusions *de novo* and factual findings for clear error.  *In re Brown*, 742 F.3d at 1315.  Our review of the facts is highly deferential; a factual finding is clearly erroneous only when we, after reviewing all the evidence are "left with the definite and firm conviction that a mistake has been committed."  *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573, 105 S. Ct. 1504, 1511 (1985) (citation and internal quotation marks omitted).  This deference extends both to findings based on witness credibility and factual findings based on documentary evidence.  *Id.* at 574, 105 S. Ct. at 1511-12.  Significantly, we cannot reweigh the evidence on appeal, even if we would have reached a different conclusion.  *Id.* at 573-74, 105 S. Ct. at 1511 ("This standard plainly does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently.").

Porter Capital's arguments fail here because Porter Capital essentially asks us to reweigh the evidence, a task we cannot undertake.  For starters, Porter Capital insists that the delivery tickets and invoices should have been afforded more weight as evidence of delivery.  But assigning weight to the evidence is a classic

20

fact-finder function.   And, given the admittedly lax record-keeping systems in place at both Custom and Sobcon, we find nothing clearly erroneous about the court's discounting of this documentary evidence.

Porter Capital also insists that Haley's testimony about the legitimacy of the invoices and the delivery of materials should have been given more weight because Haley was "the only witness with firsthand knowledge of their legitimacy."  Again, Porter Capital asks us to reweigh the evidence.  And again, we find nothing clearly erroneous about the court's conclusion.  Although Haley testified that he did not fabricate the invoices, it is not, by any means, clear that he had firsthand knowledge of legitimacy because his secretary would typically prepare the invoices from the delivery ticket.  Similarly, while Haley testified that the material was "[m]ost certainly" delivered to Sobcon, he did not testify that he undertook or witnessed the deliveries himself.  Nor does the record contain other evidence that he participated in or observed the deliveries.  Moreover, Haley's own credibility was impeached, to some extent, by the financial pressures he was under—which could have motivated fraud—and the testimony of Rogers suggesting that Haley had previously obtained cash advances on invoices that were never mailed to customers.

Porter Capital further contends that Sobcon's evidence should be discounted primarily because of the discrepancy between its initial averment that all nineteen

invoices were fabricated and its subsequent discovery that five invoices were legitimate. While this discrepancy may raise credibility concerns, we find no clear error in the Bankruptcy Court's handling of this evidence. The court did recognize the credibility problem associated with Sobcon's evolving accountings. *In re Haley*, 2013 WL 5592890, at *6 ("If Sobcon did another 'thorough accounting' and 'full investigation,' would more of the Disputed Invoices turn out to be legitimate? It is entirely possible, and such possibility makes this court unable to rely on the record keeping of Sobcon."). But even after recognizing and weighing this point in its consideration of the evidence, the court still found that Porter Capital had failed to establish delivery by a preponderance of the evidence. Based on the conflicting testimony and evidence in this case, we are not left with a firm conviction that the court erred in finding insufficient evidence to establish delivery.

Finally, Porter Capital has repeatedly suggested in its briefs and during argument that the Bankruptcy Court found that the invoices were *not fraudulent*, so the material necessarily must have been delivered. To the extent that Porter Capital is asserting that this represents an error of law, its argument squarely conflicts with the record. As expressly detailed in its opinion, the Bankruptcy Court found only that Porter Capital had failed to establish fraud; it did not find by a preponderance of the evidence that the invoices were not fraudulent or were otherwise legitimate. *In re Haley*, 2013 WL 5592890, at *7-9. Absent a finding of

legitimacy, Porter Capital is incorrect that the failure-to-prove-fraud finding automatically proves delivery. Accordingly, we find no error in the Bankruptcy Court's conclusion, adopted by the District Court, that Porter Capital failed to prove that the materials were delivered to Sobcon.

## D.

In its final argument on appeal, Porter Capital maintains that the Bankruptcy Court erred in determining that Sobcon did not have sufficient notice of the factoring agreement before making three invoice payments directly to Custom in September 2010. The sole basis for this argument is Porter's claim that Sobcon owner Scarbrough and employee Rogers were aware they should be paying Custom's invoices directly to Porter Capital.[3] This argument is unpersuasive for the reasons discussed below.

The Bankruptcy Court determined that Sobcon did not receive adequate notice under the statute[4] of the factoring agreement until October 15, 2010, when

---

[3] Porter Capital also makes an argument on appeal that Alabama law, including the commentary to Alabama's UCC, saddles Sobcon with double-payment liability for failing to affirmatively clarify any notice of assignment it received. We, however, find nothing in Alabama law to support this view of liability. The potential for double-payment liability is triggered under the statute only when the notice is effective. Ala. Code § 7-9A-406(a). Failure to inquire about an ambiguous notice may put the account debtor at risk that the notification may later be determined to be effective, but nothing in the statute or commentary suggests an account debtor is required to clarify or incurs liability merely by not clarifying an ambiguous notice regardless of the effectiveness of the notice.

[4] The Alabama statute provides, in relevant part,

23

Sobcon received a certified letter from Porter Capital informing Sobcon of Porter's rights as assignee. In rejecting Porter Capital's arguments that notice occurred earlier, the court found that while Haley had told Scarbrough about the agreement generally sometime between November 2009 and September 2010, Scarbrough was never made aware of the legal implications of the factoring agreement. The court recognized that each of the disputed invoices instructed payment be made to "Custom Steel c/o Porter Capital" at Porter's P.O. Box address, but the court held that it was unreasonable to view the remittance address as informing Sobcon of any assigned rights, particularly when the address still listed "Custom Steel" as an addressee.

---

(a) *Discharge of account debtor; effect of notification.* Subject to subsections (b) through (i), an account debtor on an account, chattel paper, or a payment intangible may discharge its obligation by paying the assignor until, but not after, the account debtor receives a notification, authenticated by the assignor or the assignee, that the amount due or to become due has been assigned and that payment is to be made to the assignee. After receipt of the notification, the account debtor may discharge its obligation by paying the assignee and may not discharge the obligation by paying the assignor.

(b) *When notification ineffective.* Subject to subsection (h), notification is ineffective under subsection (a):

(1) if it does not reasonably identify the rights assigned;

. . . .

Ala. Code § 7-9A-406.

24

In addition, while Porter Capital employee Gena Pond testified that, as a company practice, Porter Capital sent a UCC notice with every invoice it mailed out, the court expressly chose not to credit this testimony and instead found the practice was not regularly followed, basing its determination on the complete lack of supporting documentation of any such notice and the testimony of Rogers, who said she did not recall receiving any such notices with Porter's invoices. Finally, while Rogers also testified that Sobcon had previously remitted payments to Porter Capital based on verbal instructions, no indication exists that Rogers was advised of the legal implications of a factoring agreement or payment assignment.

We discern no error in the Bankruptcy Court's conclusions here. Even if Scarbrough and Rogers had been verbally instructed to send payments to Porter Capital, they were not reasonably informed of the rights assigned. An effective notice requires that "the account debtor must be notified of two things. First, he must receive notice that the 'amount due or to become due has been assigned.' Second, the account debtor must also be notified that 'payment is to be made to the assignee.'" *Estate of Haas v. Metro-Goldwyn-Mayer, Inc.*, 617 F.2d 1136, 1139 (5th Cir. 1980) (construing the relevant provision of the UCC as previously codified at § 9-318(3), which provision has the same pertinent language).[5]

---

[5] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

At most, the verbal instructions to pay Porter Capital satisfied the second element but not the first.  Directing a payment did not reasonably inform Sobcon of the assignment, a legal transfer to Porter Capital of the rights to Custom's payments.  The record reflects that Scarbrough and Rogers did not understand that Porter Capital was entitled to the payments, as opposed to, for example, that Porter Capital merely facilitated collection on behalf of Custom.  Nor does the record show that Sobcon was advised of or understood the potential double liability Sobcon would incur if it instead paid Custom directly.

Similarly, the ambiguous remittance address, listing both Custom and Porter Capital, failed to identify any assigned rights.  It established, at most, that Porter Capital would receive payments, not that Porter Capital was entitled by assignment to retain those payments.

Moreover, the statute clearly contemplates a written notice by requiring authentication.[6]  Arguably, then, any verbal notification would have been invalid as a matter of law.  The only evidence on the record of a written notification of assigned rights is the October 15, 2010, letter.  Although Pond testified that Porter Capital sent written notices, no such notice was placed in the record.  The Bankruptcy Court's determination that Porter Capital did not regularly send an

_____

[6] Commentary on the statute notes that the authentication requirement "normally could be satisfied by sending notification on the notifying person's letterhead or on a form on which the notifying person's name appears."  *See* Ala. Code § 7-9A-406 cmt. 2.  The Code also defines a signature as authentication.  *See* Ala. Code § 7-9A-102(a)(7)(A).

26

assignment notice and its assessment of Pond's credibility are not clearly erroneous.  For all of these reasons, we find no error in the Bankruptcy Court's determination that Porter Capital was not entitled to double payment from Sobcon.

## V.

Because we find no error in the Bankruptcy Court's proposed findings of fact and conclusions of law or in the District Court's *de novo* review and adoption of those proposed findings and conclusions, the District Court's judgment is **AFFIRMED**.